[No. C014874. Third Dist. Aug. 31, 1994.]

NATIONAL UNION FIRE INSURANCE COMPANY, Plaintiff,
Cross-defendant and Appellant, v.
LYNETTE C., Defendant, Cross-complainant and Respondent.

## COUNSEL

Robinson & Wood, Thomas R. Fellows, Matheny, Poidmore & Sears and Michael A. Bishop for Plaintiff, Cross-defendant and Appellant.

Leonard & Lyde and Robert L. Davis for Defendant, Cross-complainant and Respondent.

## OPINION

**DAVIS, Acting P. J.**—This is our second encounter with this case, the first of which also resulted in a published decision—*National Union Fire Ins. Co.* v. *Lynette C.* (1991) 228 Cal.App.3d 1073 [279 Cal.Rptr. 394] *(National*

*Union I*). The subject is insurance coverage for a foster parent who negligently fails to protect his or her foster child from sexual molestation by the other foster parent. In *National Union I*, we reversed a summary judgment in favor of National Union Fire Insurance Company (National), concluding that the language of the relevant insurance policy provided such coverage and the principles of public policy did not prohibit it. We remanded the matter to the trial court to determine another issue raised in the summary judgment proceedings, the amount of coverage.

On remand, the amount of coverage was determined in summary adjudication proceedings, and other pertinent issues were decided in a court trial. The most pertinent of these other issues concerned whether National was bound by the judgment that the foster child (Lynette) had obtained against National's insured, the negligent foster mother Debra Lopes (Debra).[1]

On appeal, National contends that Lynette's judgment against Debra, which Lynette obtained by presenting evidence of liability and damages in an uncontested court proceeding, cannot fairly be applied to National in light of principles of collateral estoppel and the "no action" clause of the insurance policy. The "no action" clause is a standard liability insurance provision that permits an injured party to sue directly an insured tortfeasor's insurance company if "the amount of the insured's obligation to pay [has] been finally determined by judgment against the insured after actual trial." (See Ins. Code, § 11580, subd. (b)(2); 3 Cal. Insurance Law & Practice, § 41.63[4][a].) In light of the California and other relevant authorities on the subject, we conclude that the term "actual trial" has two components: (1) an independent adjudication of facts based on an evidentiary showing; and (2) a process that does not create the potential for abuse, fraud or collusion. Applying this two-component test here, we conclude the judgment Lynette obtained against Debra resulted from an "actual trial."

Our approach to the "no action" clause also applies to National's argument on collateral estoppel. We therefore conclude that National is bound by the judgment that Lynette obtained against Debra.

National also contends on appeal that the trial court erred in determining the amount of coverage. We disagree. There were three successive one-year term policies in effect during the relevant time frame here. All three policies cover liability for any act, error or omission by the foster parent that occurs during the policy period and that arises out of foster parent activity while the foster child is in the foster parent's care and custody. Debra was found to

---

[1]Lynette concedes that the sexual molestations by her foster father Duane Lopes (Duane) are not covered under the National policy and cannot be covered for reasons of public policy.

have engaged in negligent supervision and care of Lynette during each of the three policy periods. Consequently, all three policies are available to satisfy the judgment.

In light of our determinations, we affirm the judgment.

## BACKGROUND

We provided some background information in our *National Union I* decision and we now quote from that decision.

"In August 1980, when Lynette was 10 years old, she was placed by Colusa County as a foster child with Debra and Duane. Beginning in October or November 1980, and continuing until Lynette was removed from the Lopeses' home in May 1983, Duane repeatedly sexually molested Lynette.

"As a result of these molestations, Duane in November 1984 pleaded guilty to violating Penal Code section 288, subdivision (a) (lewd or lascivious acts upon a child under 14 years of age).

"In August 1987, following three years of mental health treatment arising from the molestations, Lynette sued Duane and Debra (hereafter, the Lopes action). As to Debra, Lynette alleged she was negligent in allowing Lynette's placement in the Lopeses' foster home because Debra knew, or should have known, that Duane had a propensity to sexually molest children, and Debra was negligent in not protecting Lynette from Duane's molestations.

"In February 1988, National filed a complaint for declaratory relief, contending that neither Duane nor Debra was covered under the National insurance policy for the allegations in the Lopes action.

"Pursuant to stipulation, the Lopes action was tried before a judge as an uncontested matter in September 1988. Judgment was rendered against Duane and Debra, jointly and severally, in the amount of $1,250,000. The trial court found that Debra's failure to use reasonable care to prevent Lynette's molestation injuries 'was, along with [Duane's] batteries, a concurring legal cause of harm' to Lynette." (*National Union I, supra*, 228 Cal.App.3d at p. 1076, fns. omitted.)[2]

During the trial of National's declaratory relief suit, which comprises the proceedings before us, evidence was submitted concerning the decision to

---

[2]After obtaining judgment in the Lopes action, Lynette cross-complained in National's declaratory relief action and sought satisfaction of the judgment from National.

present the Lopes action as an uncontested matter. That evidence showed the following.

Lynette's attorney, Robert L. Davis, testified that the Lopes action was scheduled for trial on Monday, August 29, 1988. On the weekend before that date, Charles Painter, National-retained counsel for Debra, phoned Davis. Painter proposed a settlement short of a jury trial because he thought the facts were too repugnant to present to a jury.[3] Davis was anxious to avoid a jury trial as well because he did not want Lynette to have to relay her experiences to 12 people. Davis proposed a $1,250,000 settlement against Debra, and Painter tentatively accepted.

Upon further reflection, Davis became concerned about the binding nature of such a stipulated judgment against Debra. On the day set for trial, therefore, Davis dismissed that option. Instead, he told the assembled defense counsel—Painter, Phillip Jaret (the National-retained counsel for Duane), and Donald Wahlberg (*Cumis* counsel for Duane)[4]—that he would proceed at that time either with the scheduled jury trial or with an uncontested court trial at which he would submit evidence on liability and damages and the judge "would make up his mind on those issues." All three noted defense counsel agreed to the uncontested procedure.

When the Lopes action was called for trial, the trial judge said he understood there was an agreement. But *Cumis* counsel for Debra, John Edwards, whom Davis had never heard about previously, appeared and said he did not know the nature of the agreement. The transcript of this hearing in the Lopes action, which was before the trial court in National's declaratory relief action, showed that Painter told the judge in the Lopes action that he had not had the chance to explain fully the agreement to Debra or Edwards; Painter was then given the opportunity to do so. After this, Edwards informed the judge in the Lopes action that an agreement had been reached.

Davis then outlined the agreement on the record in the Lopes action and reiterated it in a letter to all defense counsel, including the attorney representing National in the pending declaratory relief action, Michael

---

[3]Over National's objection, the trial court admitted this testimony from Davis "to show Mr. Painter's state of mind towards settling short of trial." On appeal National does not challenge this ruling, but claims the trial court sustained its objection.

[4]*San Diego Federal Credit Union* v. *Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494, 50 A.L.R.4th 913] (insurer is obligated to provide its insured with independent defense counsel when particular conflicts exist between the insurer and the insured; see Civ. Code, § 2860).

Bish op.[5] In exchange for a covenant by Lynette not to execute against any personal assets of Debra or Duane, and an additional covenant to seal the records in the Lopes action and not disclose any terms of any judgment rendered therein (except as appropriate in National's declaratory relief action), Debra and Duane would agree to treat the Lopes action as an uncontested matter with Lynette, through Davis, presenting evidence regarding liability and damages to the court for its decision on those issues. Davis further explained that the parties would not have to relitigate liability and damages in the declaratory relief action.

All of the defense counsel in the Lopes action agreed to this procedure save for Painter who remained neutral. Prior to Davis outlining the agreement, Painter had informed the court in the Lopes action that he found himself in an "enormous conflict situation." After Davis outlined the proposal, Painter further explained that he was retained by National to represent Debra, that National had reserved its rights regarding coverage and had filed a declaratory relief action, and that Edwards had assumed Debra's defense. With that said, Painter indicated his neutrality. Edwards confirmed that he had assumed Debra's defense.

Painter maintained this posture on the record when the uncontested proceeding in the Lopes action was heard some two weeks later. Painter added that although he had several telephone conversations with Attorney Davis during the weekend before the Lopes action was scheduled for trial, at no time did he (Painter) offer to stipulate to a judgment with National's approval. At the uncontested proceeding, Davis confirmed that Painter had reported to him that National would not agree to a stipulated judgment.

The uncontested proceeding in the Lopes action encompassed an approximately one-and-one-half-hour hearing with Davis presenting evidence on liability and damages. This evidence included Lynette's deposition, Duane's deposition, the sheriff's investigation report, the depositions of a psychiatrist and of a vocational rehabilitation expert who had examined Lynette, as well as several reports detailing Lynette's mental health and employment prospects.

In a written decision, the trial court in the Lopes action stated that this "trial came on before the Court sitting without a jury on September 12, 1988," and that after "hearing the evidence and considering the applicable law, the Court grants judgment in favor of [Lynette] and against [Duane and Debra] jointly and severally in the amount of $1,250,000." In this decision, the Lopes court found that "[c]ommencing in October or November of 1980

---

[5]Two weeks before the scheduled trial date in the Lopes action, Bishop attended a settlement conference for that case at which Lynette rejected a $200,000 settlement offer.

and thereafter at least once each month until May 20, 1983, [Duane] committed sexual acts on [Lynette]"; that "[Debra], in the exercise of due care, should have known that bringing [Lynette] into the home of [Debra] and [Duane], as a foster child, created a reasonably foreseeable risk that [Lynette] would be injured by sexual acts committed on [Lynette] by [Duane];" that "[Debra] failed to use reasonable care to prevent said reasonably foreseeable risk of injury to [Lynette] by [Duane]"; and that "[Debra's] failure to use reasonable care to prevent said reasonably foreseeable injury to [Lynette] by [Duane] was, along with [the] batteries by [Duane], a concurring legal cause of harm to [Lynette]."

In National's declaratory relief trial, John Edwards's deposition was admitted into evidence. Edwards was Debra's *Cumis* counsel in the Lopes action. In his deposition, Edwards said he was apprised by Painter (National-retained counsel for Debra in the Lopes action) of ongoing discussions between Painter and Davis (Lynette's counsel) concerning a tentative agreement to resolve the Lopes action short of a jury trial. Apparently, National was concerned about the horrendous nature of the case. Edwards also said that the agreement between Davis and Painter to resolve the matter short of a jury trial was a deal advocated by Painter that did not involve Edwards's input; that Painter on several occasions in Edwards's presence had phone conversations with National representatives (including adjusters), the substance of which Painter would then relay to Edwards; that Painter also had contact with Bishop (National's counsel in the declaratory relief action); and that National had little interest in whether the Lopes action was resolved in an uncontested fashion (so long as it was resolved within certain financial limits), but was greatly concerned about Lynette's case becoming public knowledge because another foster child was already suing the Lopeses for sexual improprieties and there were other potential plaintiffs. Edwards added that Painter had full control of Debra's defense throughout all stages of the proceedings; that his (Edwards's) involvement was limited to ensuring that any resolution protected Debra financially; and that Painter's comments in the Lopes action that Edwards had assumed control of Debra's case struck him "as somewhat unanticipated, but at the same time, it was clear that there was absolutely no case to take control over;" the case had already been resolved by Davis and Painter and "I was merely advised as to what the resolution was."

In National's declaratory relief action, the trial court determined, in the parties' respective motions for summary adjudication, that all three National insurance policies were available to satisfy the judgment (i.e., that the amount of coverage is $1.5 million). A court trial then took place in the declaratory relief action.

On appeal the issues are limited to whether the trial court had jurisdiction to decide matters other than the amount of coverage, whether the judgment arising from the uncontested court proceeding in the Lopes action satisfies the "actual trial" requirement of the "no action" clause and can bind National, and whether the trial court properly determined there is $1.5 million in insurance coverage. As we shall explain, we answer "yes" to all these questions.[6] Consequently, we affirm.

DISCUSSION

1. *Jurisdiction*

██ Lynette contends that our disposition language in *National Union I* limited the trial court's jurisdiction on remand to the question of the amount of coverage. We disagree.

Our disposition in *National Union I* provided: "The judgment is reversed. The trial court is directed to vacate the summary judgment for National and to enter an order granting a summary adjudication of issues specifying that the National insurance policy provides coverage for Debra's negligent acts as determined by the court in the Lopes action. However, because the trial court in these summary judgment proceedings determined that exclusion (b) excluded coverage, it is unclear whether the court considered another issue raised therein: the amount of coverage provided by National's three 1-year-term insurance policies—National's so-called 'stacking' issue. Consequently, we remand the matter to the trial court to determine that issue, if it still remains an issue, to make an order thereon, and to incorporate that order and the order granting summary adjudication of issue specified above in one final judgment. . . ." (*National Union I, supra,* 228 Cal.App.3d at pp. 1086-1087.)

*National Union I* reviewed a summary judgment in favor of National specifying that Debra's negligent acts were not covered because of an exclusion in the insurance policy. That summary judgment, which we reversed, therefore concerned a threshold issue in the declaratory relief action and did not address the issues that eventually comprised the trial in that action. Consequently, the trial court in the declaratory relief action had

---

[6]Lynette on appeal raises an issue concerning the implied covenant of good faith and fair dealing. However, Lynette has not filed an appeal in this case. Therefore, she waives that issue. In any event, the issue becomes moot in light of our resolution. Lynette is also the party questioning the scope of the trial court's jurisdiction following our remand in *National Union I.* That issue is not waived by Lynette's failure to appeal because it involves subject matter jurisdiction, which generally cannot be waived. (See Code Civ. Proc., § 430.80; *Chromy* v. *Lawrance* (1991) 233 Cal.App.3d 1521, 1524 [285 Cal.Rptr. 400].)

jurisdiction to decide issues that were not determined in *National Union I* and that were necessary to resolve the case. (See *Steelduct Co.* v. *Henger-Seltzer Co.* (1945) 26 Cal.2d 634, 644 [160 P.2d 804]; cf. *Rice* v. *Schmid* (1944) 25 Cal.2d 259, 263 [153 P.2d 313].)[7]

2. *The Issue of "Actual Trial" and the Binding Effect of the Judgment in the Lopes Action*

■ National argues it is not bound by the judgment that Lynette obtained against its insured, Debra, in the Lopes action. That judgment, National contends, violated the "no action" clause of the applicable insurance policies because it was not a "judgment against the insured after actual trial." In an almost twin contention, National relies on the principles of collateral estoppel and asserts it is unfair to bind it to this judgment. We disagree.

The "no action" clause is a standard provision in liability insurance policies that had its genesis in Insurance Code section 11580, subdivision (b)(2) (hereafter, section 11580). (*Rose* v. *Royal Ins. Co.* (1991) 2 Cal.App.4th 709, 714 [3 Cal.Rptr.2d 483] (*Rose*); see 3 Cal. Insurance Law & Practice, *supra*, §§ 41.60, 41.63[1] & [4][a].) The code section states a liability insurance policy cannot be issued in California unless it contains a provision "that whenever judgment is secured against the insured . . . in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment."

In *Rose*, the court rejected an argument that the "no action" clause is void under Insurance Code section 11580. The cornerstone of that argument was that while the "no action" clause permits an action against the insurer only if a judgment is entered against the insured "after actual trial," section 11580 requires simply that a judgment be "secured" against the insured. (*Rose*, *supra*, 2 Cal.App.4th at p. 714.) In rejecting this argument, the court in *Rose* said the standard "no action" clause does not defeat the purpose of section 11580 or conflict with its provisions, but protects an insurer's "legitimate interest in not being made to indemnify its insured pursuant to a judgment based on collusion between the insured and the injured party." (*Id.* at p. 716.)

---

[7]We do note, however, that the summary judgment proceedings in *National Union I* did determine the issue of whether the judgment in the Lopes action had been obtained through fraud or collusion. As we stated in *National Union I*: "In the summary judgment proceedings, National also contended that the judgment in the Lopes action was obtained through fraud or collusion. The trial court below found against National on this point. National has neither contested this finding in this appeal nor filed a protective cross-appeal. Consequently, we deem that issue resolved." (*National Union I, supra*, 228 Cal.App.3d at p. 1087, fn. 5.) Of course, this passage remains valid.

After setting this backdrop, the *Rose* court considered what constituted a "judgment after actual trial." Quoting from a 1955 Texas appellate court decision, the court in *Rose* said "[t]he term 'judgment after actual trial' presupposes 'a *contest* of issues leading up to final determination by court or jury, in contrast to a resolving of the same issues by agreement of the parties; i.e., *without a contest.*'" (*Rose, supra,* 2 Cal.App.4th at p. 716, quoting *Wright* v. *Allstate Insurance Co.* (Tex.Civ.App. 1955) 285 S.W.2d 376, 379-380 (*Wright*), original italics.)

The judgment at issue in *Rose* fell short of this test because it was a consent judgment by which the injured party and the insured agreed to liability and damages; in other words, the judgment was "merely a contract of the parties [that was] entered by the court exercising an administrative function in simply recording what [had] been agreed upon." (*Rose, supra,* 2 Cal.App.4th at p. 716.)

The judgment at issue in the Texas *Wright* decision is quite similar to the judgment at issue in *Rose.* (See *Wright, supra,* 285 S.W.2d at pp. 378-379.) It is clear, therefore, that neither of these cases involved a judgment that resulted from a proceeding like the one before us. Although *Rose* retained *Wright*'s emphasis on "contest," it is noteworthy that such a contest is defined "'in contrast to a resolving of the same issues by agreement of the parties [i.e., the injured party and the insured].'" (*Rose, supra,* 2 Cal.App.4th at p. 716; *Wright, supra,* 285 S.W.2d at pp. 379-380.) And that is just what happened in *Rose* and *Wright*: the injured party and the insured *resolved* the issues of liability and damages *by agreement.*

Here, there was no such agreement and the trial court did not act simply as an administrative "rubber stamp." (See *Smithers* v. *Mettert* (Ind.App. 1987) 513 N.E.2d 660, 664-665 (*Smithers*).) *Rose* adopted the *Wright* language so that insurers would not be bound by collusive judgments resulting from agreements between only the injured party and the insured. When we examine how Texas decisions after *Wright* have characterized that opinion and how California decisions after *Rose* have analyzed the question of whether an insurer is bound by a judgment against its insured, it becomes apparent that *Rose* provides a starting point but not an ending one for determining the binding nature of the proceeding at issue here.

In *Russom* v. *United Services Automobile Association* (W.D.Tex. 1956) 143 F.Supp. 790 (*Russom*), the insurer, citing *Wright*, claimed that the judgment upon which the plaintiffs had sued was not "after actual trial" but was in effect an agreed judgment. (*Russom, supra,* at p. 795.) In the proceeding leading to this judgment, the plaintiffs (i.e., the injured parties) testified at

length regarding the facts of the accident and the damages they suffered. A doctor testified at length regarding the injuries to one of the plaintiffs, Margaret Russom. The attorney for the plaintiffs argued the case to the court and stated that although Margaret would accept whatever the judge awarded, he believed a judgment of $20,000 should be awarded. No defense was offered and no cross-examination was made. The defense attorney stated that if the judgment did not exceed $20,000, he had agreed with the plaintiffs' attorney not to appeal. The court "thereupon pronounced judgment in favor of the plaintiff Margaret Russom in the sum of $20,000." (*Id.* at pp. 792-793.)

The court in *Russom*, apparently applying Texas law, deemed the *Wright* case "clearly distinguishable" because ". . . the [*Wright*] judgment showed on its face that a compromise settlement had been effected and the judgment recited 'that such compromise by way of agreed judgment' should be approved." (*Russom, supra*, 143 F.Supp. at p. 795.) The *Russom* court then rejected the insurer's "actual trial" argument. (*Id.* at pp. 795-796.)

In both *Gulf Insurance Company* v. *Vela* (Tex.Civ.App. 1962) 361 S.W.2d 904 (*Gulf*) and *Pioneer Casualty Company* v. *Jefferson* (Tex.Civ.App. 1970) 456 S.W.2d 410 [48 A.L.R.3d 1076] (*Pioneer*), the Texas appellate courts held that a default judgment entered after the presentation of evidence to the trial court was an "actual trial" within the meaning of the "no action" clause. (*Gulf, supra*, at p. 908; *Pioneer, supra*, at p. 413.) In *Gulf*, the insurer refused to defend and the insured did not appear at the trial either personally or through an attorney. (*Gulf, supra*, at p. 908.) At the trial against the insured, the injured person and his doctor testified in response to questions from the injured party's attorney and the trial judge. (*Ibid.*) In *Pioneer*, the insurer refused to defend, the insured did not appear personally but his attorney did, and the insured's attorney admitted liability and waived a jury. (*Pioneer, supra*, at p. 413.) Both *Gulf, supra*, and *Pioneer, supra*, distinguished *Wright* because it involved a judgment that was no more than a court-approved compromise agreement between the injured party and the insured.

It is true that in these post-*Wright* decisions, unlike in the present case, the insurer refused to defend. But it is also true that, with the exception of *Gulf*, this refusal did not affect the courts' views as to what constitutes an "actual trial" under the "no action" clause. (See *Pioneer, supra*, 456 S.W.2d at p. 413; *Smithers, supra*, 513 N.E.2d at pp. 664-665.) It is also worth noting that in the cases discussed above, the trial determinations were based on an independent review of the evidence rather than a pro forma, rubber stamp exercise. (See *Smithers, supra*, at pp. 664-665, including fn. 2.)

A look at several post-*Rose* California decisions on the subject of whether an insurer is bound by a judgment against its insured shows a similar

concern that the judgment result from a process that encompasses an independent adjudication of facts which does not create the potential for abuse or collusion.

In *Studley* v. *Benicia Unified Sch. Dist.* (1991) 230 Cal.App.3d 454 [281 Cal.Rptr. 631] (*Studley*), the insured settled with the injured party by stipulating to a judgment for $500,000 in exchange for a covenant not to execute. In the insurer's suit in intervention, the appellate court found the insurer was not bound by the stipulated judgment because it did not consent to entry of judgment and in fact explicitly stated at the settlement hearing that it would not be bound by the stipulation. (*Id.* at p. 460.)

In *Smith* v. *State Farm Mut. Auto. Ins. Co.* (1992) 5 Cal.App.4th 1104 [7 Cal.Rptr.2d 131] (*Smith*), the insured and the injured party entered into a stipulated judgment with a covenant not to execute similar to one at issue in *Studley*. (*Id.* at pp. 1108-1109.) The insured assigned to the injured party all of his potential claims against one of his insurers for failure to defend or settle. The court in *Smith* concluded that such a judgment could not be used against the insurer in a subsequent bad faith action. The court reasoned "that to sanction such a transaction 'would be to invite collusion between the claimants and the insured' by allowing them to 'bootstrap[] their damages with the ingenious assistance of counsel.' " (*Id.* at p. 1114, quoting from *Doser* v. *Middlesex Mutual Ins. Co.* (1980) 101 Cal.App.3d 883, 892-893 [162 Cal.Rptr. 115] (*Doser*).)

That brings us to the quite pertinent decision in *Wright* v. *Fireman's Fund Ins. Companies* (1992) 11 Cal.App.4th 998 [14 Cal.Rptr.2d 588] (*Fireman's Fund*), which considered the kind of judgment against an insured that is required for a direct action against the insurer under Insurance Code section 11580. In *Fireman's Fund*, the insured and the injured party entered into a $1 million stipulated judgment with a covenant not to execute. (11 Cal.App.4th at p. 1003.) The transcript of the hearing on the stipulated judgment "contained no evidentiary support for the amount of damages contained in the judgment." (*Id.* at pp. 1023-1024.) The transcript additionally showed that the stipulation was negotiated by the insured's personal counsel and that while the insured was also represented by insurance defense counsel, the insurance defense counsel stated he could neither oppose nor consent to the stipulated judgment. (*Id.* at p. 1024.)

The insurer in *Fireman's Fund* argued that it could not be bound by the settlement and stipulated judgment in which it did not participate and to which it did not consent. Since the judgment was based on the injured party's covenant not to execute against the insured, argued the insurer, that

eliminated any interest the insured might have in resolving the issues of liability and damages in good faith. (*Fireman's Fund, supra*, 11 Cal.App.4th at p. 1013.) The insurer asserted that the entire purpose of the settlement arrangement was to convert the injured party's personal injury suit into a direct action against the insurer "for money damages of $1 million without the benefit of an iota of evidence." (*Ibid.*) The insurer also claimed it could not intervene in the underlying suit without prejudicing its insured and risking an action for bad faith. Due process required that the insurer have its day in court, stated the insurer. (*Ibid.*)

For the most part, the court in *Fireman's Fund* agreed with these arguments, emphasizing, as did the *Smith* and *Doser* courts, the potential for abuse and collusion in this situation. As *Fireman's Fund* noted: "With no personal exposure the insured has no incentive to contest liability or damages. To the contrary, the insured['s] best interests are served by agreeing to damages in any amount as long as the agreement requires the insured will not be personally responsible for those damages." (*Fireman's Fund, supra*, 11 Cal.App.4th at p. 1023.) In line with these views, the *Fireman's Fund* court held that "where an insurer provide[s] a defense to its insured in the underlying litigation, and the insured, without the participation or consent of the insurer, stipulate[s] to a judgment without evidentiary support and with no potential for personal loss, such judgment is insufficient to impose liability on the insurer in a later action against the insurer under section 11580." (*Id.* at p. 1024, fn. omitted.)

In *Xebec Development Partners, Ltd.* v. *National Union Fire Ins. Co.* (1993) 12 Cal.App.4th 501 [15 Cal.Rptr.2d 726] (*Xebec*), the court also considered the binding effect on an insurer of a stipulated judgment between an injured party and an insured with a covenant not to execute against the insured. According to *Xebec*, such a judgment "should *bind* the insurer only to the extent it represents a true independent adjudication of the insured's liability." (*Id.* at p. 544, italics in original.) In reaching this conclusion, the court in *Xebec* observed that a "default [judgment] proving-up proceeding preserve[s] a semblance of independent adjudication under court supervision which is wholly lacking" in the context of a stipulated judgment for a covenant not to execute. (*Id.* at p. 541.)

Finally, in *Lipson* v. *Jordache Enterprises, Inc.* (1992) 9 Cal.App.4th 151 [11 Cal.Rptr.2d 271] (*Lipson*), the court expressed its concern about a "trial" masking what really was a stipulated judgment. In that case, a salesman on commission sued clothing manufacturers for breach of an employment contract. The manufacturers' insurer denied coverage and refused to defend. Pursuant to a stipulation between the salesman and the manufacturers, the

salesman filed an amended complaint just two days before trial. This amendment included causes of action for negligence and defamation for which there likely was insurance coverage. A 25-minute, virtually uncontested trial was then conducted with the salesman as the only witness. The trial court found for the salesman on the negligence and defamation causes of action, and denied the insurer's motion to vacate the judgment pursuant to Code of Civil Procedure section 473. (*Lipson, supra,* 9 Cal.App.4th at pp. 154-156.)

In reversing the denial of the motion to vacate, the court in *Lipson* stated that "clearly something seems amiss in the circumstances surrounding the 'trial': the last-minute stipulation to amend the complaint with new causes of action arguably covered by the policy and the extremely perfunctory trial itself with virtually no opposition from defendant. It appears that the trial was substituted for a stipulated judgment, in order to provide unchallengeable findings of negligence and defamation, with the aim of creating some form of policy coverage." (*Lipson, supra,* 9 Cal.App.4th at p. 158.)

In reviewing these decisions issued in the wake of the *Wright* and *Rose* opinions, it is apparent that a trial does not have to be adversarial to be considered an "actual trial" under the "no action" clause, or to be considered binding against the insurer in a section 11580 proceeding. (See *Smithers, supra,* 513 N.E.2d at pp. 664-665.) In deciding whether a judgment involving the injured party and the insured is binding on the insurer, courts focus on whether the facts have been adjudicated independently in a process that does not create the potential for abuse, fraud or collusion. This concern is heightened when the injured party provides the insured with a covenant not to execute. From this distillation, we conclude that the term "actual trial" in the standard "no action" clause has two components: (1) an independent adjudication of facts based on an evidentiary showing; and (2) a process that does not create the potential for abuse, fraud or collusion. As we explain, the proceeding at issue in this case satisfied these two requirements. As we also explain, this same approach applies in the collateral estoppel sphere. For these reasons, National is bound by the judgment that Lynette obtained against Debra in the Lopes action.[8]

As for the requirement of an independent adjudication, Lynette and Debra did not resolve the issues of liability and damages in the Lopes action. A court did. In an approximately one-and-one-half-hour proceeding, Lynette

---

[8]In the present case, we have analyzed the *binding* nature on an insurer of a judgment against its insured arising from an "actual trial." We have not addressed the *presumptive* effect on an insurer of a judgment against its insured arising from a settlement between the insured and the injured party after the insurer has breached the insurance contract. (See, e.g., *Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 791-792 [244 Cal.Rptr. 655, 750 P.2d 297]; *Xebec, supra,* 12 Cal.App.4th at pp. 544-558.)

presented an array of evidence to the court regarding these two issues. As for liability, Lynette submitted her deposition, Duane's deposition, a letter she had penned, and the sheriff's investigation report that included some incriminating admissions on Debra's part. As for damages, Lynette submitted the depositions of a psychiatrist and a vocational rehabilitation expert who had examined her, as well as a battery of reports from mental health and vocational experts. In explaining to the trial court in the Lopes action how the parties had arrived at an uncontested proceeding, Lynette's counsel, Robert Davis, did acknowledge that the parties had discussed a damage figure of $1,250,000. In his next breath, however, Davis stated he had not placed "that kind of a limit on it because again I don't want the insurance company at a later on date to come in and say this judgment was conclusive [*sic*] and fraudulent." Davis then added: "I'm asking the Court to look at the evidence and make its own independent decision as to what is fair and reasonable compensation in this matter." The court later noted: "Very well, the Court will take it under submission, and I will read all of the material presented and get out a written ruling, and I will also make findings. [¶] Mr. Davis has made a request for findings. The Court will make findings on the items requested. Whether I will make . . . specific findings, I won't decide until I've read the material." We conclude that the Lopes action encompassed an independent adjudication of facts based on an evidentiary showing.

That leaves the issue of whether the uncontested proceeding in the Lopes action created the potential for abuse, fraud or collusion. The evidence in National's declaratory relief action showed that just one or two days before the Lopes action was scheduled for trial, Charles Painter, the National-retained counsel for Debra, phoned Lynette's counsel, Davis. Both men wanted to avoid a jury trial. There was evidence that National wanted to minimize any publicity surrounding the Lopes action. It appears that many other children had passed through the Lopes foster home. Indeed, another foster child was suing the Lopeses for sexual improprieties at the time of Lynette's suit. Debra's *Cumis* counsel in the Lopes action, John Edwards, testified in a deposition admitted into evidence in the declaratory relief action that Painter was in control of Debra's defense, that Painter was in extensive contact with National representatives (including adjusters), and that National wanted the Lopes action kept under wraps.

Davis testified in the declaratory relief action that he and Painter agreed, during their phone conversations just prior to the scheduled trial in the Lopes action, to resolve the Lopes action via a $1,250,000 stipulated judgment. On *further reflection, Davis became concerned about the binding nature of such* a judgment. Therefore, on the day of trial, he proposed to Painter that they

could proceed either via the scheduled jury trial or the uncontested route described above. Davis said that Painter, as well as the National-retained counsel and the *Cumis* counsel for Duane, opted for the uncontested route.

At this point, Attorney Edwards entered the picture, Painter said he had a conflict of interest, and Edwards and Painter discussed privately Davis's proposal. Edwards then indicated his acceptance of the uncontested proceeding. Painter told the court in the Lopes action that Edwards had assumed Debra's defense and Edwards concurred. In his subsequent deposition, Edwards explained that this comment from Painter seemed odd because there was nothing to assume at that point—Painter and Davis had already resolved how the matter would proceed.

Davis outlined the following agreement on the record in the Lopes action: in exchange for a covenant not to execute and a nondisclosure agreement (with the court records being sealed), the Lopes action would proceed as an uncontested matter and the court would decide liability and damages based on evidence Davis presented. This proceeding, noted Davis, would be binding in National's declaratory relief action. National's attorney in the declaratory relief action, Michael Bishop, who had attended a settlement conference in the Lopes action two weeks before the trial date, was sent a copy of Davis's letter to counsel detailing this agreement.

Against this backdrop, Painter explained to the court in the Lopes action that he had a conflict of interest and therefore remained neutral.

These facts show a process that did not create the potential for abuse, fraud or collusion. Looking at the process from National's perspective, there was more than an agreement between an injured party and an insured to exchange a covenant not to execute for an uncontested proceeding.

First, there was a nondisclosure agreement that encompassed a sealing of the court records. This agreement greatly benefited National, given the small parade of potential plaintiffs through the Lopes foster home. Second, the uncontested proceeding involved a court independently adjudicating the facts based on an array of evidence. As National itself acknowledged in *Xebec*, a "default proving-up proceeding preserve[s] a semblance of independent adjudication under court supervision which is wholly lacking" in the context of a stipulated judgment given for a covenant not to execute. (*Xebec*, *supra*, 12 Cal.App.4th at p. 541.) The *Xebec* court thought this point was "well taken." (*Ibid.*) So do we. The uncontested proceeding here was not simply a substitute for a stipulated judgment. (See *Lipson*, *supra*, 9 Cal.App.4th at p. 158.) Finally, there is substantial evidence that National

played a significant role in furthering the agreement underlying the uncontested proceeding. (See *Fireman's Fund, supra,* 11 Cal.App.4th at p. 1024.)

We conclude that the uncontested proceeding in the Lopes action satisfied the "actual trial" requirement of National's "no action" clause and that Lynette can maintain an action against National based on her judgment in the Lopes action.

■ Our two-component "actual trial" test also applies to National's argument that it is not collaterally estopped from relitigating the liability and damages determined in the Lopes action. ■ "[A] party will be collaterally estopped from relitigating an issue only if (1) the issue decided in a prior adjudication is identical with that presented in the action in question; *and* (2) there was a final judgment on the merits; *and* (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication. [Citation.] This requirement of identity of parties or privity is a requirement of due process of law. . . . [¶] . . . In the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, and adequate representation by, the losing party in the first action as well as that the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication." (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 874-875 [151 Cal.Rptr. 285, 587 P.2d 1098], italics in original.)

■ National cannot claim it is unfair to bind it to the judgment in the Lopes action. The evidence shows that the uncontested proceeding in the Lopes action was given in exchange for a covenant not to execute *and* a nondisclosure agreement. National stood to gain handsomely from the nondisclosure accord. Although Debra offered no defense to Lynette's evidence on liability and damages in the Lopes action, the uncontested proceeding involved an independent adjudication of facts based on an evidentiary showing. National never challenged the trial court's finding that the judgment in the Lopes action was not obtained through fraud or collusion. (*National Union I, supra,* 228 Cal.App.3d at p. 1087, fn. 5.) Most importantly, there was substantial evidence in the declaratory relief action showing that National participated, in a significant way, in the agreement encompassing the nondisclosure accord and the uncontested proceeding. National sought to minimize its exposure relating to the Lopes foster home, while still putting Lynette to a test of independent (albeit uncontested) adjudication. In outlining the agreement regarding the uncontested proceeding in the Lopes action, Attorney Davis noted that any judgment therein would be binding in National's declaratory relief action so that the issues of liability and damages

would not have to be relitigated. Thus, National was able to further its interests in the Lopes action, satisfying the requirements of community of interest and adequate representation, and should reasonably have expected to be bound by the judgment in that action.

We conclude that National is collaterally estopped from relitigating the issues of liability and damages litigated in the Lopes action and that National is bound by the judgment in that action.[9]

### 3. The Amount of Insurance Coverage

■ During the nearly three years that Lynette resided in the Lopes foster home and experienced Debra's negligent care, there were three similar, successive one-year term liability insurance policies in effect from National that insured Debra as a foster parent. The trial court determined in summary adjudication proceedings that all three policies were available to satisfy the judgment in the Lopes action. Each of these policies contains a $500,000 coverage limit. We agree with the trial court's determinations.

---

[9]As part of its collateral estoppel argument, National asserts the covenant not to execute precludes a "recovery against" Debra within the meaning of Civil Code section 2778, subdivision 5 and therefore the judgment in the Lopes action is not binding against National.

Civil Code section 2778, subdivision 5, states that in construing indemnity contracts, "the following rules are to be applied, unless a contrary intention appears: . . . [¶] 5. If, after request, the person indemnifying neglects to defend the person indemnified, a recovery against the latter suffered by him in good faith, is conclusive in his favor against the former." Section 2778, subdivision 5, concerns the binding effect against an indemnitor of a good faith recovery against the indemnitee when the indemnitor has refused to defend. We do not face that situation here.

One court has noted that a stipulated judgment with a covenant not to execute will not bind the insurer under section 2778, subdivision 5, because it does not represent a "recovery against" the insured—instead, the covenant shields the insured from liability. (*Smith, supra,* 5 Cal.App.4th at p. 1114.) For two reasons, *Smith* is of no help to National here. First, it is one thing to say that a certain resolution has no binding effect for section 2778, subdivision 5, purposes; it is quite another to say that it has no binding effect at all. Section 2778, subdivision 5, covers a limited domain and tackles a particular problem. Secondly, on a more practical level, the present case does not involve a stipulated *judgment* with a covenant not to execute.

As another court has put it in interpreting section 2778, subdivision 5: ". . . [A]n indemnitor should not be permitted to relitigate a fair number fairly arrived at." (*Aero-Crete, Inc.* v. *Superior Court* (1993) 21 Cal.App.4th 203, 211 [25 Cal.Rptr.2d 804] [an indemnitee does not suffer a recovery in good faith where it stipulates to liability in exchange for a covenant not to execute].) Our previous discussion shows that the Lopes judgment was "fairly arrived at" from National's perspective. And another decision—one upon which National has relied in this argument—has concluded that no "recovery" is "suffered" unless it is obtained by a judgment "after trial." (*Peter Culley & Associates* v. *Superior Court* (1992) 10 Cal.App.4th 1484, 1495-1496 [13 Cal.Rptr.2d 624].) As we have explained, there was a judgment "after trial" in the Lopes action.

The relevant language of the insurance policies is as follows: "DECLARA-TIONS . . .

"Coverages and limits of liability: the limit of the Company's liability against each of the following coverages shall be as stated herein, subject to all terms and conditions of this policy.

"*Coverage*
"A. Foster Parents Liability $500,000.00 each claim
" $500,000.00 aggregate

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[text of policy]

"*Coverage A*: *Foster Parents Liability*
"To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of any act, error or omission of the Insured and arising out of the Insured's activities as a Foster Parent occurring while the foster child is in the care and custody of the Foster Parent. Such coverage hereunder shall include, but not be limited to, bodily injury, property damage or personal injury for which the Insured is held legally liable.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"*Policy Period*

"This policy applies to acts, errors or omissions . . . occurring during the policy period. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"*Condition 2 - Limits of Liability*

"Under Coverage A, the limit of liability stated in the Declarations as applicable to 'each claim' is the total limit of the Company's liability for all damages because of such act, error or omission regardless of the number of claims made or suits brought in connection with the same act, error or omission, and applies separately to each foster home. The limit of liability stated in the Declarations as 'aggregate' is the total limit of the Company's liability hereunder for all damages."

On this issue the trial court ruled as follows: "Pursuant to direction from the Court of Appeal, this Court is to determine the amount of coverage

provided by National's three, one-year-term insurance policies. The Court finds that the judgment in [the Lopes action], insofar as here relevant, is based on the negligent breach of [Debra's] duty to prevent a series of molestations of [Lynette] by [Duane]. The Court concludes that Debra's duty to prevent harm to [Lynette] was breached each time [Lynette] was molested by Duane, i.e., there was a series of distinct breaches of her duty to protect [Lynette] which occurred during each policy period. The Court notes that Debra could, at any time, have ceased her negligent omissions by terminating foster care, providing supervision of Duane or taking other steps to prevent the harm which occurred. It is further concluded that under the language of the policies, Debra's distinct acts of negligent omission during each policy period trigger the coverage of the policy in effect during that period of time. Accordingly, all three policies are available to satisfy the judgment."

National raises several procedural and substantive objections to this ruling. We turn to those now.

### A. The Procedural Objections

In this context, National claims the trial court erred in four ways.

First, National claims the trial court had no subject matter jurisdiction to resolve the issue regarding the amount of coverage. Since the court adjudicated this matter as an "issue" rather than as a "cause of action," National argues, the court contravened the 1990 legislative amendments to the summary judgment statute which largely dispensed with the motion for summary adjudication of issues.

The answer to this claim is that the parties raised the issue of the amount of coverage in their *1989* motions for summary judgment and adjudication of issues. We remanded the matter in this context. (*National Union I, supra*, 228 Cal.App.3d at pp. 1086-1087.) National's argument regarding the lack of subject matter jurisdiction is therefore mistaken.

Second, National asserts the trial court had no factual or evidentiary record on which to adjudicate summarily the issue of the amount of coverage. According to National, the entire evidentiary record presented to the trial court on this issue consisted of the insurance policies and the pleadings, findings and judgment in the Lopes action. National claims these evidentiary materials were silent on the question of the amount of coverage.

National's view of the record on this issue is a bit hyperopic. It fails to see the evidence it submitted in the relevant summary adjudication motions.

This evidence included the records comprising the criminal action against Duane, the transcript of the uncontested proceeding in the Lopes action, and excerpts from Lynette's deposition.[10] In her deposition excerpts, Lynette testified about the nature and frequency of Duane's molestations and some of the circumstances under which they occurred. The transcript of the uncontested proceeding, as detailed previously, contained an abundance of evidence related to Debra's liability and Lynette's damages. Finally, in its separate statement of undisputed facts, National, while contending as a matter of law that Lynette "has one claim for sexual molestation and negligent supervision against the LOPES Defendants," acknowledged as a matter of fact that "the instances of conduct that constitute that claim continued over a period of several years but commenced during the year 1980." On this record, the trial court in the summary adjudication proceeding could conclude that Debra was negligent toward Lynette in each of the three policy periods. That brings us to National's third point.

■ National claims that even if the evidentiary record were adequate to make these conclusions, a procedural barrier forecloses a court from reaching these determinations in summary adjudication proceedings. This is because such proceedings are for finding issues, not determining them. (See e.g., *Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 36 [210 Cal.Rptr. 762, 694 P.2d 1134].) But this argument ignores the corollary of the principle on which it relies. If a trial court finds, on the evidence presented in a summary adjudication proceeding, that there is no triable issue of material fact regarding a particular issue, then that issue necessarily has been determined summarily. (See *Kurokawa* v. *Blum* (1988) 199 Cal.App.3d 976, 988-989 [245 Cal.Rptr. 463].) That is what happened here. The trial court concluded in the summary adjudication proceeding that "there was a series of distinct breaches of [Debra's] duty to protect [Lynette] which occurred during each policy period." On the evidence presented by both Lynette and National in that proceeding, there was no triable issue of material fact regarding this conclusion. National never sought in the summary proceeding to discover evidence contrary to this conclusion. (See Code Civ. Proc., § 437c, subd. (h).) There is nothing in the record indicating that National was foreclosed in any way from submitting evidence in the summary adjudication proceeding on any matter involving the amount of coverage.[11] There being no triable issue of material fact as to this issue, the trial court determined it summarily. That leads us to National's fourth and final procedural objection.

---

[10]National asked the trial court in the summary adjudication proceeding to take judicial notice of the criminal records and the transcript. There is nothing in the record indicating the trial court failed to do so.

[11]In its motion for summary adjudication, National originally did raise the issue of continuing the hearing for further discovery on the question of fraud or collusion between Lynette and Debra. The trial court in *National Union I* subsequently found there was no such

National contends the trial court in the summary adjudication proceeding incorrectly gave collateral estoppel effect to the judgment in the Lopes action; the Lopes action, National argues, did not involve the issue of the amount of coverage, and on that issue Debra and National would have been at loggerheads. As we have seen, the trial court in the summary adjudication proceeding had before it an adequate evidentiary record on which to consider the issue of the amount of coverage. Although the court found that the "judgment [in the Lopes action] . . . is based on the negligent breach of [Debra's] duty to prevent a series of molestations of [Lynette] by Duane," there is no indication the court ignored the evidentiary record before it and deemed National collaterally estopped by the Lopes action judgment on the issue of the amount of coverage.

We conclude that National's procedural objections are unwarranted and we turn to its substantive contentions.

B. *The Substantive Contentions*

Basically, National contends the trial court misinterpreted the three policies at issue here.

The declarations of the three policies state there is coverage for foster parent liability in the amount of $500,000 for "each claim" and $500,000 in the "aggregate." Under the coverage portion of the policies, National agrees "[t]o pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of any act, error or omission of the Insured and arising out of the Insured's activities as a Foster Parent occurring while the foster child is in the care and custody of the Foster Parent." The policies "appl[y] to acts, errors or omissions . . . occurring during the policy period." A "Limits of Liability" provision notes that "the limit of liability stated in the Declarations as applicable to 'each claim' is the total limit of [National's] liability for all damages because of such act, error or omission regardless of the number of claims made or suits brought in connection with the same act, error or omission . . . . The limit of liability stated in the Declarations as 'aggregate' is the total limit of [National's] liability hereunder for all damages."

When the interpretation of an insurance policy does not involve the credibility of extrinsic evidence—and that is the case here—an appellate court can independently determine the policy's meaning. (*National Union I, supra*, 228 Cal.App.3d at p. 1077.) "The words used in an insurance

---

fraud or collusion and National never challenged that finding. (*National Union I, supra*, 228 Cal.App.3d at p. 1087, fn. 5.)

policy are construed in their ordinary and popular sense."(*Id.* at p. 1078.) The policy is construed as a whole, each clause helping to interpret the other. (*Ibid.*) "If, in light of the whole contract and the case's circumstances, a provision is reasonably susceptible to two or more unstrained constructions, the provision will be found to be ambiguous. . . . Ambiguities normally are resolved by adopting a reasonable interpretation that affords coverage to the insured." (*State Farm Fire & Casualty Co.* v. *Elizabeth N.* (1992) 9 Cal.App.4th 1232, 1236 [12 Cal.Rptr.2d 327] (*Elizabeth N.*), citations omitted.)

 The most striking feature of the National policies is that they are "act, error or omission" policies. The coverage provision applies to damages "because of any act, error or omission." The policy period provision states the policies "appl[y] to acts, errors or omissions . . . occurring during the policy period." Even the limit of liability provision focuses on "such act, error or omission" and the "same act, error or omission." The emphasis on acts, errors or omissions during the policy period is undeniable.

This language, read in its ordinary and popular sense, states that each of the three policies affords a maximum of $500,000 coverage for acts, errors or omissions that occur during the one-year term of that policy.[12] Since Debra was found to have been negligent toward Lynette during the annual terms of all three policies, all three policies afford coverage.

This matter-of-fact construction accords with California decisions that have construed insurance policies providing coverage for acts, errors or omissions committed during the policy period. As noted in *Travelers Ins. Co.* v. *National Union Fire Ins. Co.* (1989) 207 Cal.App.3d 1390 [255 Cal.Rptr. 727] (*Travelers*): "The policy provides in plain, clear words that it provides coverage for 'acts or omissions' committed during the policy period. We understand these words in their ordinary meaning. [Citation.] We hold that . . . the giving of wrong tax advice during the . . . policy period was an 'act or omission' which triggered coverage under that policy." (*Id.* at p. 1399.) The court in *Arant* v. *Signal Ins. Co.* (1977) 67 Cal.App.3d 514 [136 Cal.Rptr. 689] (*Arant*) struck a similar chord: "The operation, or coverage, of the policy . . . is predicated on 'any act, error or omission' of the insured. The assertedly negligent advice upon which [the insured's] liability to [the injured party] is predicated was rendered . . . prior to the commencement of the policy period, and [the insurer] was therefore not required to defend and

---

[12]The "each claim" limit states the maximum amount the insurer will pay for an act, error or omission during the policy period. The "aggregate" limit states the maximum amount the insurer will pay during the policy period. (See 3 Cal. Insurance Law & Practice, *supra*, § 46.12[2][a].)

indemnify [the insured]." (*Id.* at p. 518; see also *Chamberlin* v. *Smith* (1977) 72 Cal.App.3d 835, 845-847 [140 Cal.Rptr. 493] (*Chamberlin*).)

As Lynette persuasively queries in this respect: "If National had not issued its July 1, 1980 to July 1, 1981 policy, could it now reasonably claim that its July 1, 1981 to July 1, 1982 policy does not provide coverage for the negligence of Debra which caused damage during that policy period, simply because she had been similarly negligent and caused similar damage before July 1, 1981? Plainly not, at least not if we apply the language of National's policies." We think the trial court had it right in concluding that "there was a series of distinct breaches of [Debra's] duty to protect [Lynette] which occurred during each policy period."

Needless to say, National is greatly troubled by this view of things. National argues that the only "conceivably recognizable breach of duty" is Debra's active undertaking of a foster care relationship with Lynette when Debra knew or should have known that this relationship posed a danger to Lynette because of Duane's pedophiliac history. This breach of duty, National argues, occurred only once, in 1980, when the foster care relationship was initially undertaken. According to National, "[i]t was not, and could not have been, 'negligent' for [Debra] to 'fail to prevent' Duane's molestations on (allegedly) numerous subsequent occasions, and therefore it could not have been an 'act, error, or omission' (by Debra) to have 'failed to prevent' the molestations on each of the alleged occasions they occurred."

National's view is too limited. While it is true that Debra is not responsible for Duane's criminal acts, she is responsible for her negligent ones. She was found to have provided negligent supervision and care in this foster care context during each of the policy periods. As Lynette persuasively argued in the trial court, "National apparently fails to recognize, or refuses to acknowledge, that because of [Debra's] failure to protect Lynette, Lynette was repeatedly raped during the policy periods of each of its three policies, and fails to recognize or acknowledge that each and every separate rape [resulting from Debra's negligent supervision] . . . caused injury. Does National truly believe—or more importantly, does National expect this Court to believe—that only [Debra's negligent supervision and care regarding] the first rape caused injury?"

Citing *Bay Cities Paving & Graving, Inc.* v. *Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854 [21 Cal.Rptr.2d 691, 855 P.2d 1263] (*Bay Cities*) and *Elizabeth N.*, *supra*, 9 Cal.App.4th 1232, National argues "the relevant focus is *not* the mere *number* of discrete and separate 'acts.' Rather, the focus is on the *nature* of the *duty* violated and on the *nature* of the 'primary right' at

stake. If there is only *one* claimant, *one* insured, *one* lawsuit, *one* cause of action, one duty at stake, one 'primary right' violated, and one 'cause,' then, by definition, there is only one relevant 'claim,' and the *'per claim' limitation of the policy is the relevant limitation, regardless of the number of discrete 'negligent acts' that may be parsed to constitute that 'claim.' "* (Italics in original.) The basic problem with this argument is the language of the policies at issue, which provide coverage for acts, errors and omissions that occur during the policy period. (See *Travelers, supra,* 207 Cal.App.3d at p. 1399; *Arant, supra,* 67 Cal.App.3d at p. 518; *Chamberlin, supra,* 72 Cal.App.3d at pp. 845-847.) Furthermore, the decisions in *Bay Cities* and *Elizabeth N.* support our analysis.

In *Bay Cities,* a general contractor was owed money on a construction project. The attorney representing the contractor failed to serve a stop notice on the project's construction lenders and failed to file a complaint to foreclose the mechanic's lien. As a result of the attorney's two omissions, the contractor was unable to collect this debt. (*Bay Cities, supra,* 5 Cal. 4th at p. 857.)

The contractor then sued its attorney. The attorney's professional liability insurance policy limited coverage to a maximum of $250,000 "for each claim" and further stated, " 'Two or more claims arising out of a single act, error or omission or a series of related acts, errors or omissions shall be treated as a single claim.' " (*Bay Cities, supra,* 5 Cal.4th at p. 857.)

The issue in *Bay Cities* was whether the attorney's two omissions constituted one claim or two claims under the policy's $250,000 per claim limit. The court adopted the one claim view.

In support of this holding, the *Bay Cities* court reasoned that the contractor had one primary right—the right to be free of negligence by its attorney in connection with the particular debt collection for which he was retained. The attorney breached that right in two ways, but it nevertheless remained a single right. As the court further explained, "[the contractor] suffered a single injury as a result of its attorney's [two] omissions—the inability to collect the amount owed . . . [¶] . . . [W]hen, as in this case, a *single* client seeks to recover from a *single* attorney alleged damages based on a *single* debt collection matter for which the attorney was retained—there is a *single* claim under the attorney's professional liability insurance policy." (*Bay Cities, supra,* 5 Cal.4th at pp. 860-861, italics in original.) Or, as the *Bay Cities* later put it, " '[t]he effect is singular; one debt was lost to the detriment of one client.' " (*Id.* at p. 865.)

*Bay Cities* grounded its focus on the single injury sustained by the contractor. The attorney's two omissions did not result in distinct injuries or

even increase the single injury sustained. The attorney's two failings simply meant the contractor could not perfect its mechanic lien and collect what it was owed.

This sensible view employed in *Bay Cities* becomes nonsensical when applied to our facts. To apply this view, we would be forced to conclude that several acts of negligent care resulting in several rapes wreak no more harm than one such act and rape. Needless to say, the *Bay Cities* court's focus on one injury does not help National here.

That brings us to *Elizabeth N.*, which involves facts that are quite similar to the present case but policy language that is quite different.

The issue in *Elizabeth N.* was whether multiple instances of negligent care and supervision in a child care setting, which allowed several children to be molested repeatedly, constituted multiple occurrences under an insurance policy. The policy had a limit of $100,000 per occurrence and stated in its "limit of liability" clause that " '[a]ll bodily injury . . . resulting from any one accident or from continuous or repeated exposure to substantially the same general conditions shall be considered to be the result of one occurrence.' " (*Elizabeth N., supra*, 9 Cal.App.4th at pp. 1234, 1236.)

The court in *Elizabeth N.* rejected the argument that the number of occurrences is determined by examining the number of separate, discrete negligent acts or omissions committed. The court said that argument "would nullify the clear language of the policy[]" stating that all bodily injury resulting from continuous or repeated exposure to substantially the same general conditions would be considered the result of one occurrence. (*Elizabeth N., supra*, 9 Cal.App.4th at pp. 1237-1238.) As the court noted: "The stipulated facts establish that Lynn [the child care provider] negligently failed to provide adequate care and supervision for the children, which resulted in repeated molestation of the children by Byron [Lynn's husband]. Therefore, the multiple injuries suffered by each child resulted from repeated exposure to substantially the same general conditions. Even if each injury Byron inflicted on a child resulted from a new negligent act by Lynn, each act of negligence by Lynn was substantially the same—a failure to care for and supervise the child adequately." (*Id.* at p. 1238.)

Although the facts in *Elizabeth N.* mirror those here, the respective insurance policies could hardly be any more different. *Elizabeth N.* involved an occurrence policy that defined, in its limit of liability provision, a single occurrence as repeated exposure to substantially the same general conditions. This definition was the fulcrum of the *Elizabeth N.* decision. By

contrast, the policies before us cover liability for acts, errors or omissions occurring during the policy period, and, in their limit of liability provisions, reiterate their liability focus on "such act, error or omission" and the "same act, error or omission." (See 3 Cal. Insurance Law & Practice, *supra*, §§ 41.30[1], [4][c], [7][d]; 46.02[1]; 46.07[1], [2]; 46.08[3][b].) Although stated in a slightly different context, the following language from *Travelers*, *supra*, 207 Cal.App.3d 1390 is apt: "[T]he instant Travelers policy provides coverage for 'acts' or 'omissions' committed during the coverage period. The word 'occurrence' does not appear in the Travelers policy [or in the relevant part of the National policies at issue here]. National Union maintains, and we agree, that the trial court erred in applying a general 'occurrence' rule rather than focusing on the particular language of the Travelers policy." (*Id.* at p. 1395.) Our focus must be on the policies before us rather than on the policy before the court in *Elizabeth N.* Indeed, because of this very contrast, *Elizabeth N.* supports our interpretation of the National policies.

In arguing when coverage is "triggered" by the National policies, the parties refer peripherally to cases that involve continuing injury or acts that extend over several policy periods of different successive insurers. (See, e.g., *Home Ins. Co.* v. *Landmark Ins. Co.* (1988) 205 Cal.App.3d 1388 [253 Cal.Rptr. 277] (*Home Ins. Co.*); *California Union Ins. Co.* v. *Landmark Ins. Co.* (1983) 145 Cal.App.3d 462 [193 Cal.Rptr. 461]; *Fireman's Fund Ins. Co.* v. *Aetna Casualty & Surety Co.* (1990) 223 Cal.App.3d 1621 [273 Cal.Rptr. 431] (*Aetna*); *Prudential-LMI Com. Insurance* v. *Superior Court* (1990) 51 Cal.3d 674 [274 Cal.Rptr. 387, 798 P.2d 1230] (*Prudential-LMI*); see also 3 Cal. Insurance Law & Practice, *supra*, §§ 41.30[7][c], 46.08[3][c], 49.17[1].) These cases have adopted various theories to determine which insurer has to pay: for example, the theories of "exposure," or "manifestation," or "continuous exposure." (See *Hancock Laboratories, Inc.* v. *Admiral Ins.* (9th Cir. 1985) 777 F.2d 520, 523-524.) The questions presented in these cases continue to divide courts throughout the country. (See 3 Cal. Insurance Law & Practice, *supra*, § 46.08[3][c].)

It is unnecessary for us to travel very far into this fray. As we have explained, Debra's negligence can be characterized as discrete acts or omissions during each policy period causing distinct and additional injury. In this way, the present case is more akin to decisions that have applied the "exposure" theory than to cases that have applied the "manifestation" theory.

Under the "manifestation" theory, which California courts have applied to cases of continuing property damage (*Prudential-LMI*, *supra*, 51 Cal.3d 674; *Aetna*, *supra*, 223 Cal.App.3d 1621), the date the damage first manifests

itself determines which successive carrier must provide coverage for the entire loss. (*Prudential-LMI, supra,* 51 Cal.3d 674; *Aetna, supra,* 223 Cal.App.3d 1621; *Home Ins. Co., supra,* 205 Cal.App.3d at pp. 1392-1393.) Under the "exposure" theory, by contrast, each successive insurer is liable for its policy period in which there is exposure to an injury-causing agent. (*Home Ins. Co., supra,* at p. 1394.) The "exposure" theory, for example, has been applied to asbestos bodily injury cases. Asbestos lung disease progresses slowly without symptoms for many years, but because scar tissue forms within a short time of inhalation, courts adopting the exposure theory view each formation of scar tissue as a separate occurrence of bodily injury in a continuing tort. (*Ibid.,* and cases cited therein.) As the court in *Home Ins. Co.* noted: "Common sense tells us that property damage cases, even those involving continuous damage . . . , differ from asbestos bodily injury cases where injury is immediate, cumulative and exacerbated by repeated exposure." (205 Cal.App.3d at p. 1395.)

National's basic theme is that Lynette has made only one claim and is therefore limited to the $500,000 in coverage for "each claim" set forth in the declarations. But this argument ignores the policies' focus on acts, errors or omissions that occur during the policy period, ignores the allegations in Lynette's complaint that Debra was negligent in allowing Lynette's placement *and* negligent in not protecting Lynette, and ignores the trial court's factual conclusion that there was a series of distinct breaches of Debra's duty to protect Lynette which occurred during each policy period. (See *Arant, supra,* 67 Cal.App.3d at pp. 517-518; *Chamberlin, supra,* 72 Cal.App.3d at pp. 845-846.) National centers much of this argument on the "limit of liability" clause. But that clause provides in part: "[T]he limit of liability stated in the Declarations as applicable to 'each claim' is the total limit of the Company's liability for all damages because of *such act, error or omission* regardless of the number of claims made or suits brought in connection with the *same act, error or omission* . . . ." (Italics added.) Again, the policy's focus on individual acts, errors or omissions is apparent.

This "limit of liability" clause can be contrasted with the one at issue in *Aetna Life and Cas. Co.* v. *McCabe* (E.D.Pa. 1983) 556 F.Supp. 1342 (*McCabe*), which stated in part: "The limit of liability stated in the declarations as applicable to 'each claim' is the limit of the company's liability for all damages because of each claim or suit covered hereby." (*Id.* at p. 1357.) In *McCabe,* a doctor was sued for malpractice after having a sexual relationship with his patient for six years and living with her during part of that time. The court rejected the patient's contention that "each claim" meant each year that the six one-year term policies were in effect. "Under the plain meaning of the phrase 'each claim or suit,' even when read in the context of six policies, [patient] had only one claim or suit against [doctor]. [Patient]

has brought one lawsuit against [doctor] for his course of conduct over a six year period. . . . [¶] . . . The jury was not asked to consider separate torts in several years . . . ." (*Id.* at pp. 1357-1358.)

In *McCabe*, the limit-of-liability clause focused on "each claim or suit" and the jury did not consider separate torts in several years. By contrast, the limit-of-liability clause here focuses on "such act, error or omission" and the "same act, error or omission," and the trier of fact did consider separate torts in separate years.

It is this contrast that also distinguishes the major case upon which *McCabe* relies, *Zipkin* v. *Freeman* (Mo. 1968) 436 S.W.2d 753 (*Zipkin*). In *Zipkin*, a psychiatrist was sued for malpractice for having an affair and live-in arrangement with a patient. In discussing a limit-of-liability clause similar to that in *McCabe*, the *Zipkin* court noted that the doctor's acts and omissions "*continuously* occurred over the three-year period. His was a *continuing tort* for which [patient] would have *one* claim . . . ." (*Zipkin*, *supra*, at p. 764.)

*McCabe* noted two other cases: *Pioneer Nat. Title Ins. Co.* v. *Andrews* (5th Cir. 1981) 652 F.2d 439 (*Andrews*), upon which it relied; and *St. Paul Fire & Marine Ins. Co.* v. *Hawaiian Ins. & Guaranty Co.* (1981) 2 Hawaii App. 595 [637 P.2d 1146] (*Hawaiian*), which it distinguished. In *Andrews*, an attorney who prepared three improper certificates of title was deemed to have committed a single, continuing act of malpractice which gave rise to a single claim under an insurance policy limiting liability to $100,000 for each claim. In *Andrews*, however, the attorney testified he relied on the earlier certificates to prepare the later ones. (*Andrews*, *supra*, at p. 443.) In *Hawaiian*, the court found that three separate claims arose when the insureds negligently administered anesthetic to a patient on three occasions. The facts in the present case are more akin to those in *Hawaiian* than to those in *Andrews*. (See also the cases cited in *Zipkin*, *supra*, 436 S.W.2d at pp. 763-764: *Krey Packing Co.* v. *Employers' Liability Assur. Corp.* (Mo.App. 1939) 127 S.W.2d 780 [yearly insurance policy renewal created separate liability for the defalcations of an employee for each year]; *Rice* v. *Provident Life & Accident Ins. Co.* (1937) 231 Mo.App. 560 [102 S.W.2d 147] [policy renewal created a new and distinct contract for the period of time covered by the renewal, and on the same terms as those contained in the renewal policy].)

National complains that our interpretation reads out of existence the "each claim" limit. Not so. Pursuant to the limit-of-liability clause, " 'each claim' is the total limit of the Company's liability for all damages because of such act, error or omission *regardless of the number of claims made or suits*

*brought in connection* with the same act, error or omission." (Italics added.) In other words, multiple claims based on the same act, error or omission are subject to a $500,000 limit on coverage. (See *Bay Cities, supra,* 5 Cal.4th at p. 861.) This dovetails nicely with the policies' focus on acts, errors or omissions, and our interpretation does no violence to this principle. (See also fn. 12 *ante.*) In fact, the tables can be turned on this argument to claim that National's interpretation reads out of existence the policies' focus on acts, errors or omissions that occur during the policy period.

Even if we assume the National policies are ambiguous concerning the amount of coverage here, our interpretation is a reasonable one given this focus. (See *Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912, 916, fn. 7 [226 Cal.Rptr. 558, 718 P.2d 920].) We conclude there is $1.5 million in insurance coverage available in this case.[13]

## DISPOSITION

The judgment is affirmed.

Scotland, J., and Nicholson, J., concurred.

---

[13]There is no challenge on appeal regarding the trial court's decision to apportion "the total amount of the judgment . . . equally between the three policies."