[No. D020822. Fourth Dist., Div. One. Mar. 31, 1997.]

MANUEL J. ANDRADE, Intervener and Appellant, v.
DENNIS EDWARD JENNINGS, Defendant and Respondent.

COUNSEL

Higgs, Fletcher & Mack, John Morris, Webb, Smelko & Carey and Patrick D. Webb for Intervener and Appellant.

Rice, Fowler, Booth & Banning and Norman J. Ronneberg, Jr., for Defendant and Respondent.

## OPINION

**KREMER, P. J.**—Intervener Manuel J. Andrade appeals a judgment after jury trial favoring defendant Dennis Edward Jennings (sued as Underwriters at Lloyd's, London) on Andrade's complaint-in-intervention for declaratory relief and breach of contract. Attacking the jury's special verdicts sustaining Jennings's defense of collusion, Andrade contends such defense was barred as a matter of law and unsupported by substantial evidence. We affirm the judgment.

## I

### INTRODUCTION

Jennings issued an excess liability policy to tuna boat captain Andrade's employer. Suffering shipboard injury, Andrade made a claim against his employer and the vessel. Andrade filed state and federal lawsuits. Since Andrade's employer's primary insurer was insolvent, the employer and the vessel's lienholders sought to settle Andrade's claim without impairing their interests in the vessel. Eventually, without informing Jennings, the employer

settled with Andrade for an amount invoking Jennings's excess policy. Andrade agreed not to execute against his employer's assets including the vessel, with the employer assigning to Andrade all its rights against excess insurer Jennings.

Under the settlement agreement, Andrade dismissed his state lawsuit against his employer. However, agreeing that Andrade could obtain judgment in his federal lawsuit against his employer in an amount invoking the excess policy issued by Jennings, Andrade and his employer scheduled a prove-up hearing in the federal court. Jennings was then notified of the settlement agreement and scheduled hearing. At the prove-up hearing Andrade presented evidence and his employer offered no defense. The federal court entered judgment favoring Andrade in the requested amount. Although notified of the prove-up hearing, Jennings declined to attend due to his belief such appearance would be pointless in light of Andrade's employer's effective admission of liability as part of the settlement.

Andrade then intervened in his employer's state lawsuit against Jennings. As a third party beneficiary of the excess policy issued by Jennings and as his employer's assignee, Andrade sought recovery from Jennings. Defending against Andrade's claim, Jennings asserted the federal judgment was unenforceable as the result of Andrade's collusion with his employer. After the superior court granted summary adjudication/judgment favoring Andrade, we reversed and remanded on the limited ground the record contained evidence raising triable factual issues on Jennings's defense of collusion. Upon remand, the defense of collusion was tried to a jury. The jury returned special verdicts favoring Jennings. Andrade appeals, attacking the verdicts as lacking legal or evidentiary support since despite notice Jennings did not timely intervene in the federal lawsuit.

## II

### FACTUAL AND PROCEDURAL BACKGROUND

We state the facts stipulated by the parties. We state other facts in the light most favorable to Jennings.

### A

#### *Jennings Issues Excess Policy*

On behalf of his syndicate, Lloyd's of London underwriter Jennings issued to Jorge Fishing, Inc. (Jorge), owner of the tuna seiner M/V Maria

C.J., a protection and indemnity insurance policy for the period February 16, 1983, to February 16, 1984, covering claims exceeding $1 million up to a limit of $5 million (the excess policy). American Maritime Services Corporation (American Maritime) was the vessel's primary insurer, providing liability coverage up to $1 million.[1] Ultimately, American Maritime became insolvent.

## B

### Andrade's Shipboard Injury

Andrade worked as a commercial fisherman. Andrade never worked in any other occupation.

In July 1983 the M/V Maria C.J. was docked in Puerto Rico. During loading of aviation fuel onto the vessel, some of the fuel oil spilled onto the wet deck. The vessel's Chief Engineer Mamede walked through the spilled fuel and up a ladder to locate the vessel's 33-year-old Captain Andrade. While following Mamede back down the ladder, Andrade slipped and fell.[2]

---

[1] Jorge's excess policy issued by Jennings provided: "In the event that any claim or claims appear reasonably likely to involve Underwriters [Jennings], the Assured shall give prompt written notice to the Underwriters hereon, shall forward every summons or process (or copies thereof) served upon the Assured, and shall thereafter keep Underwriters fully advised as Underwriters may request."

Jorge's excess policy issued by Jennings stated Jennings reserved "the right and shall be given the opportunity to associate with the Assured or the Assured's underlying insurers, or both, in the defence and control of any claim suit or proceeding which in the opinion of Underwriters [Jennings] is likely to involve this insurance, in which event the Assured and Underwriters shall co-operate in such defence to the mutual advantage of both."

Jorge's excess policy issued by Jennings also provided for terms and conditions in the same form as the underlying policy. Jorge's underlying insurance policy with American Maritime provided: "[I]n the event of any occurrence which may result in loss, damage and/or expense for which this Assurer is or may become liable, the Assured will use due diligence to give prompt notice thereof and forward to the Assurer as soon as practicable after receipt thereof, all communications, processes, pleadings and other legal papers or documents relating to such occurrences." The underlying policy also provided: "The Assured shall not make any admission of liability, either before or after any occurrence which may result in a claim for which the Assurer may be liable." The underlying policy further provided: "[T]he Assured are obligated to and shall take steps to protect their (and/or the Assurer's) interests as would reasonably be taken in the absence of this or similar insurance."

[2] The ladder was a standard type common throughout the fishing industry. The ladder's steel treads had a raised diamond pattern and were coated with paint containing sand. The ladder was also covered by netting. Before the accident, Andrade did not think the ladder was defective or unsafe.

Andrade was diagnosed with lumbar strain. Due to Andrade's continued pain, doctors thought he might have compression of a nerve root or a protruded disc. Back surgery (internal fixation) was recommended.[3]

## C

### *Andrade's State Court Lawsuit Against Jorge*

In October 1983 Andrade through Attorney Dougherty sued Jorge in state court for damages for personal injuries allegedly incurred in his July 1983 accident aboard the M/V Maria C.J. (Andrade v. Maria C.J. (Super. Ct. San Diego County, 1983, No. 510275).) Andrade contended the vessel was unseaworthy due to the presence of aviation fuel on the wet deck. Andrade also contended the vessel was negligent in that its chief engineer Mamede allowed the spilling of aviation fuel. Wells Fargo Bank, the holder of a $10 million preferred ship mortgage on the M/V Maria C.J., retained the law firm of Gray, Cary, Ames & Frye (Gray Cary) to defend Jorge against Andrade's lawsuit.[4]

On October 29, 1985, Gray Cary wrote Los Angeles attorney Bradley, counsel for Jennings in another matter. Gray Cary's letter stated Andrade alleged he was "totally disabled from tuna fishing" and "we believe Mr. Andrade's claim may be in excess of $1,000,000.00, the amount of deductible after which your client's coverage begins."

On November 5, 1985, by letter to Gray Cary, Bradley stated his firm had not been retained in the Andrade matter and suggested Gray Cary have Jorge's insurance broker notify Jennings that Andrade's claim might exceed $1 million.

On December 13, 1985, Andrade submitted a settlement conference statement demanding $950,000 from Jorge.

---

[3]In May 1986 the recommended back surgery was performed.

[4]Maritime law permits a merchant seaman's in rem personal injury claim to take precedence over a bank's preferred ship mortgage, thus reducing the value of the bank's security interest in the vessel. Seeking to protect its preferred ship mortgage security interest in other vessels owned by the Jorge family, Wells Fargo Bank also hired Gray Cary to defend the Jorge family against seamen's claims in several companion cases involving those vessels. Further, in another lawsuit, Wells Fargo Bank through Gray Cary claimed that due to its $10 million mortgage it was an intended third party beneficiary of Jennings's policy covering the M/V Maria C.J.

Meanwhile, in July 1985, Jorge, Wells Fargo Bank and Southwest California Production Credit Association (PCA) filed an action against Jorge's insurance broker, Jorge's primary insurer and Jennings. (M.J. Fishing, Inc. v. Hamlin (Super. Ct. San Diego County, 1985, No. 545364).) PCA held a first preferred ship mortgage of $2.7 million on the M/V Maria C.J. Jorge, Wells Fargo Bank and PCA were represented by Gray Cary.

On December 20, 1985, Gray Cary wrote counsel for Jorge's broker. Advising that in light of American Maritime's insolvency Jorge had no primary insurance, Gray Cary requested help in notifying Jennings that Jorge demanded defense of Andrade's action. Gray Cary's letter also stated Andrade's wage loss alone could exceed $900,000 and that at least one doctor had concluded Andrade's back injuries required spinal fusion surgery. Gray Cary's letter further stated: "We have already attempted to negotiate with Mr. Andrade's attorney, William Dougherty, to assign to him all claims that the owners may have against their various insurers and against your client . . . ."

On December 27, 1985, counsel for Jorge's broker advised Gray Cary to contact Jennings's London broker. Gray Cary sent Jennings's London broker a copy of its earlier letter to Jorge's broker's counsel. Gray Cary also advised Jennings's London broker that trial was "fast approaching" and asked for an immediate response.

On January 3, 1986, Gray Cary was informed by Jennings's broker that Jennings had requested the San Francisco law firm of Hancock, Rothert & Bunshoft (Hancock) to contact Gray Cary.

In January 1986 Attorney Booth of the Hancock firm asked Attorney Kammer of Gray Cary to keep him updated on case developments including information bearing on liability, damages, medical complaints, and depositions. Kammer told Booth that Andrade's case had a $200,000 settlement value. Booth asked Kammer to provide him with any information indicating Andrade's claim might exceed $1 million.

On January 10, 1986, at the settlement conference, Andrade's Attorney Dougherty made an opening settlement demand of $950,000 against Jorge. Andrade's settlement statement took into account Andrade's claimed wage losses, his recommended back surgery, and his future medical costs. Dougherty generally expected a settlement recovery of between one-third and two-thirds of his initial demand. Gray Cary did not provide Jennings with a copy of Andrade's offer to settle for $950,000.

On May 12, 1986, PCA asked Gray Cary to seek speedy resolution of Andrade's claim and present a new settlement proposal to Andrade. PCA also told Gray Cary to fashion the settlement agreement without allowing Andrade to record a lien against the vessel and not to accept or appear to accept service of process for Jorge in any in rem federal court lawsuit.

On May 13, 1986, noting the absence of primary insurance covering Andrade's claim in light of American Maritime's insolvency, Gray Cary

asked Dougherty to present an "immediate demand" and new settlement proposal.[5]

On June 19, 1986, knowing his client Andrade was recovering well from back surgery performed the previous month, Dougherty met with Gray Cary's Kammer for about two hours to craft a settlement. Immediately after the meeting, Dougherty drafted and filed with the superior court an offer to compromise for a $1.5 million stipulated judgment. (Code Civ. Proc., § 998.)[6]

D

*Andrade's Federal Court Lawsuit Against Jorge and Vessel*

On June 25, 1986, Andrade through Attorney Dougherty sued Jorge and the M/V Maria C.J. in federal court seeking personal injury damages for negligence under the Jones Act and unseaworthiness under general maritime law. Dougherty named the vessel as a defendant in rem to preserve Andrade's rights. Gray Cary was Jorge's defense counsel.

On June 25, 1986, Gray Cary wrote Booth, enclosing medical bills for Andrade's surgery but not mentioning the recent settlement discussions with Dougherty.

On June 26, 1986, Gray Cary received Andrade's offer to compromise for $1.5 million. Gray Cary did not immediately provide Jennings with a copy of Andrade's $1.5 million demand.

On July 11, 1986, Andrade's Counsel Dougherty began discussing settlement with Attorney Driscoll of Gray Cary. Dougherty contemplated "activating" the federal lawsuit to obtain a magistrate's approval of a "stipulated judgment in the amount of 1.5 million dollars" with Andrade agreeing to a covenant not to execute against Jorge or the vessel and with Jorge assigning to Andrade its rights against Jennings.

On July 11, 1986, Gray Cary wrote to Booth about the Andrade case and payment of his medical bills without mentioning the settlement discussions or Andrade's new $1.5 million settlement demand.

On July 11 and 14, 1986, Booth spoke to Gray Cary attorneys but was not told about Andrade's $1.5 million settlement demand. During July 1986

---

[5]Although Gray Cary was technically not representing PCA against Andrade's claim, at trial Gray Cary's Kammer acknowledged he seemingly acted at PCA's behest with respect to his May 13, 1986, letter to Dougherty. Gray Cary also kept PCA apprised of the status of Andrade's claim.

[6]All statutory references are to the Code of Civil Procedure unless otherwise specified.

Gray Cary's Kammer told Booth that Andrade's claim could be settled if Jennings paid Andrade about $200,000.

On July 16, 1986, Gray Cary wrote Booth, providing surgical reports and requesting payment of medical bills but not mentioning the settlement discussions or the settlement proposal.

In mid-July 1986, Gray Cary received Andrade's economist's report estimating Andrade's wage loss at $1,243,993. Gray Cary did not immediately provide Booth or Jennings with a copy of the economist's report.

On July 24, 1986, Gray Cary wrote Booth without mentioning the settlement negotiations.

On October 3, 1986, Gray Cary wrote Booth about payment of medical bills for Andrade but did not mention the settlement negotiations.

Meanwhile, from July until November 1986, Dougherty, Gray Cary and representatives of the vessel's mortgage holders engaged in three-way settlement negotiations.

E

*Settlement of Andrade's Lawsuits Against Jorge*

In November 1986 Gray Cary's Driscoll negotiated the details of a settlement between Jorge and Andrade. Driscoll also prepared the settlement documents.

On November 14, 1986, Gray Cary mailed the proposed settlement agreement to Andrade's Attorney Dougherty.

On November 18, 1986, Gray Cary received the executed settlement agreement entitled "Assignment of Rights and Claims and Covenant Not to Execute Upon the Assets of Defendant." The settlement agreement provided Andrade would dismiss his state court action against Jorge (Andrade v. Maria C.J., *supra*, No. 510275); Andrade could "proceed forthwith to obtain a judgment" against Jorge in his federal lawsuit; Andrade would ask the federal court to award $1,493,993 economic damages; Andrade would not execute against Jorge's assets; Andrade acknowledged that Jorge would give Jennings notice of Andrade's request for judgment but Jorge "does not know and cannot control how [Jennings] will respond[]"; and Jorge assigned to Andrade its rights against Jennings.

On January 6 and 15, 1987, Gray Cary wrote Booth about Andrade's medical bills but did not mention the executed settlement agreement.

During February 1987 Gray Cary and Booth corresponded several times about Andrade's claim and payment of his medical bills. In its February 17, 1987, letter to Booth, Gray Cary stated its opinion the value of Andrade's case "probably" exceeded $1 million but did not mention the executed settlement agreement.

On February 20, 1987, Booth asked Gray Cary for information about the value of Andrade's claim.

On March 6, 1987, responding to Booth's letter, Gray Cary stated that Andrade's economist estimated Andrade's wage loss at $1,243,993. Gray Cary's letter enclosed medical reports about Andrade's injuries but did not mention the executed settlement agreement.

On May 26, 1987, Jennings first received notice that Jorge and Andrade had entered into a settlement. On that date Gray Cary wrote Booth, advising that a settlement had been reached with Andrade and enclosing a copy of the agreement. Gray Cary also advised Booth that a hearing on the settlement was scheduled for June 26, 1987. Gray Cary suggested Booth contact Dougherty directly if Jennings needed more recent medical information about Andrade.

On June 10, 1987, Booth wrote Gray Cary, expressing he was "disappointed" that Jorge was "contemplating entering into a consent judgment" on Andrade's claim. Booth told Gray Cary: "You must know that this is a clear breach of the assured's express duty of cooperation with the excess Underwriters, and will void coverage under the Policy." Booth also told Gray Cary "this is clearly an attempt on your part and that of Andrade's lawyer to manufacture a claim in the excess layer where none exists." Booth stated "this claim has not yet reached [Jennings's] layer" and that Jennings "will not be a part of, and will not be bound by, any attempt to fraudulently enter into a confessed judgment for a sum greatly in excess of what this case could reasonably be considered to be worth." Booth suggested that Gray Cary "reconsider your attempt to 'set up' the excess Underwriters, and accept their offer of a defense to this rather garden-variety claim."

On June 25, 1987, Gray Cary wrote Booth, forwarding a letter from Andrade's counsel Dougherty that he intended to seek damages of no less than $1.5 million and no more than $2 million at the federal court hearing on the settlement agreement. Gray Cary's letter reviewed the Andrade case and

advised Booth the hearing date was continued to July 17, 1987, "in order to give your clients another chance to defend the claim as they see fit . . . ." Gray Cary told Booth: "You have the opportunity to appear and to do whatever you feel is appropriate to negate the plaintiff's argument that his claim is worth more than one million dollars. If your view of the law is correct, and you prevail in your theory that your clients have no duty to pay any amount except that which exceeds one million dollars, you can easily defend this 'garden-variety' claim so that a judgment in an amount less than one million dollars is entered, thus insulating your clients from any liability."

On July 16, 1987, Gray Cary was informed by Booth's secretary that Booth would not attend the settlement hearing.

F

*Federal Court Prove-up Hearing*

On July 17, 1987, Booth did not appear at the federal prove-up hearing. Believing the settlement agreement between Jorge and Andrade had already prejudiced Jennings, Booth did not file a pleading for Jennings or "contemplate" seeking a continuance. The hearing was not reported. After the parties reviewed the documents with the federal magistrate for about half an hour, the magistrate continued the matter to July 21, 1987, to permit Jennings to appear.

On July 17, 1987, Gray Cary wrote Booth, advising that the federal settlement hearing was continued to July 21, 1987.

On July 21, 1987, the continued prove-up hearing was held before the federal magistrate. Attorney Dougherty appeared for Andrade. Attorneys Kammer and Olson appeared for Jorge. Neither Booth nor anyone else representing Jennings or other interested parties appeared. The magistrate stated he had not received a formal response or filings of any kind from any other interested party. Testifying on liability and damage issues, Andrade acknowledged jogging about four miles a day. Andrade introduced exhibits about his physical injuries, vocational rehabilitation, and economic loss. Andrade requested damages of $1,586,840.53. Jorge's attorneys waived opening and closing arguments, did not submit a defense brief and did not present any evidence. Jorge's attorneys did not object to the documentary or testimonial evidence presented by Andrade and did not cross-examine Andrade, the only witness who testified. Jorge's attorneys did not contest Jorge's liability or Andrade's damages. After the one-hour hearing, the

magistrate referred to Andrade's "massive injuries," stated there was "apparently no question with respect to the causation" and awarded the damages requested by Andrade.

Until Andrade's prove-up hearing, Dougherty's firm had not obtained a judgment or settlement exceeding $1 million on any maritime personal injury claim. Neither had there been a local judgment or settlement exceeding $1 million in a similar maritime case. The highest settlements in cases involving tuna boat captains undergoing back operations and claiming permanent disability had not exceeded $350,000.

On July 28, 1987, the federal court entered a $1,586,840.53 judgment favoring Andrade against Jorge.

In late August 1987 Jennings moved to intervene in the federal lawsuit to file an answer to Andrade's claim and a counterclaim seeking declaratory relief. The federal court denied Jennings motion to intervene, in part as too late.

Jennings did not pay Andrade the portion of the federal court judgment within the excess policy's coverage.

## G

### *Andrade Intervenes in State Court Against Jennings*

In June 1988 Andrade intervened in this lawsuit initially filed by Jorge. (San Diego Super. Ct. case No. 545364.) Andrade's complaint-in-intervention alleged he had an interest in Jorge's success in the litigation as a foreseeable third party beneficiary of Jorge's insurance contracts and as assignee of all Jorge's causes of action under those contracts against Jennings, Jorge's primary insurer and Jorge's insurance brokers for injuries Andrade incurred while employed by Jorge as master of the M/V Maria C.J.[7] Andrade's complaint-in-intervention asserted causes of action against Jennings for declaratory relief and breach of contract.[8] Andrade's pleading sought damages and a declaration Jennings was obligated to pay Andrade as Jorge's assignee $586,840 in discharge of Jennings's obligation as the excess insurance carrier.

In May 1990 the superior court summarily adjudicated five issues, to wit, that (1) res judicata prevented Jennings from relitigating issues conclusively

---

[7]In San Diego Superior Court case No. 545364, Andrade eventually settled with the broker for Jorge's primary insurer for $150,000 to $175,000.

[8]Andrade's complaint-in-intervention also alleged causes of action for breach of fiduciary duty, Insurance Code violations, and fraud and deceit. Those causes of action are not at issue in this appeal.

decided in the federal action; (2) the policy issued by Jennings to Jorge was assignable by Jorge to Andrade; (3) Jennings was under the same duty to pay damages awarded to Andrade as Jorge's assignee whether the excess policy issued by Jennings indemnified Jorge against loss or against liability and/or whether Jorge had first paid the loss; (4) Jorge did not breach the excess policy's assistance and cooperation clause by entering into the consent agreement with Andrade; and (5) the federal judgment was not the product of collusion between Jorge and Andrade. The court also determined Andrade was entitled to $586,840 judgment as a matter of law on his causes of action for declaratory relief and breach of contract. In accord with the parties' stipulation, the superior court entered a $586,840.57 judgment against Jennings on Andrade's causes of action for declaratory relief and breach of contract. Under the parties' stipulation, the court entered judgment favoring Jennings on Andrade's other alleged causes of action. Jennings appealed.

In May 1992 concluding as a matter of law that payment by Jorge to Andrade was not required before Jennings could become liable on the excess policy, we held the superior court properly summarily adjudicated the issue that the insurance coverage provided by Jennings indemnified Jorge against liability. However, because the record contained conflicting evidence raising triable factual issues on Jennings's defense of collusion, we reversed the summary adjudications on the issue of collusion and the subsumed issues whether Jorge breached the contractual assistance and cooperation clauses and whether for purposes of privity and res judicata Jorge adequately represented Jennings's interest in the federal lawsuit. In remanding the matter to the superior court, we stated the federal court judgment could have collateral estoppel effect against Jennings and the assignment by Jorge to Andrade would be upheld if upon remand Jennings's collusion-based defense were unsuccessful. (*Andrade* v. *Jennings* (May 4, 1992) D014569 [nonpub. opn.] (*Andrade I*).)[9]

---

[9]In *Andrade I*, we stated: "On this record we are unable to conclude Andrade was entitled to summary adjudication as a matter of law because the evidence raised triable factual issues bearing on whether the federal judgment was not the product of collusion between Jorge and Andrade. The transcript of the federal lawsuit suggests the prove-up hearing involving damages exceeding $1.5 million lacked attributes of an adversary proceeding. [Citation.] In the federal lawsuit Jorge waived opening and closing argument, did not submit a defense brief, did not present any evidence, did not object to documentary or testimonial evidence presented by Andrade, and did not cross-examine Andrade, the only witness who testified. [Citation.] Unlike the situation in *Samson* v. *Transamerica Ins. Co.* [(1981)] 30 Cal.3d 220 [178 Cal.Rptr. 343, 636 P.2d 32], this record contained evidence raising a triable factual issue whether defense of the federal lawsuit would have been useless or futile. [Citation.]" (*Andrade I, supra*, D014569.)

H

*Trial of Jennings's Collusion Defense Upon Remand*

In December 1993 upon remand to the superior court, Jennings's defense of collusion was tried to a jury. The parties presented extensive testimonial and documentary evidence. Three witnesses testified the reasonable settlement value of Andrade's claim was between $150,000 and $250,000. Evidence was presented that Andrade's counsel Dougherty and Jorge's counsel Gray Cary discussed, negotiated and executed a settlement agreement containing a covenant not to execute on Jorge's assets and contemplating entry of a $1.5 million federal judgment after an unopposed prove-up hearing. Evidence was presented that Gray Cary kept Jorge's creditors informed of the settlement proceedings but delayed informing Jennings. Evidence was also presented that the settlement led to a federal judgment of $1.5 million, an amount sufficient to invoke coverage under the excess policy issued by Jennings. Testifying at trial, Attorneys Dougherty and Kammer did not recall their June 19, 1986, meeting until shown Gray Cary's billing records during cross-examination.

The jury returned special verdicts affirmatively finding: (1) Jorge's conduct in entering the November 18, 1986, settlement agreement amounted to fraud against excess carrier Jennings; (2) Jorge's conduct in obtaining the federal court judgment amounted to fraud against Jennings; (3) Jorge breached the covenant of good faith and fair dealing owed to Jennings and such breach prejudiced Jennings; (4) Jorge breached the duty of assistance and cooperation contained in its excess insurance policy and such breach substantially prejudiced Jennings; (5) the November 18, 1986, settlement agreement was the product of collusion between Andrade and Jorge; and (6) the judgment awarded by the federal magistrate was the product of collusion between Andrade's counsel and Jorge's counsel.

In January 1994, based upon the jury's special verdicts, the court entered judgment that Andrade take nothing from Jennings. Andrade appeals.

III

DISCUSSION

Andrade contends Jennings should be precluded as a matter of law from arguing the defense of collusion since the evidence indicated Jennings was on notice his coverage would be involved but did not intervene in the federal lawsuit or otherwise take steps to protect his own interest. Andrade also contends there was no substantial evidence he participated in any "secret conspiracy for fraudulent purposes" or that any such conspiracy damaged

Jennings since Jennings assertedly knew everything necessary to protect his own rights in the federal lawsuit. Andrade further contends, even if the jury finding of collusion is upheld, his direct action against Jennings is not barred.

Jennings contends he proved that—once Jorge's primary insurer went bankrupt leaving Jorge potentially exposed to uninsured liability for Andrade's alleged injuries—Jorge, Andrade and their attorneys "conspired" to enter into a "secret settlement" and obtained a "non-adversarial" federal court judgment "fraudulently designed" to inflate Andrade's actual damages to trigger Jennings's excess insurance. Jennings asserts Gray Cary took such actions on behalf of its "nominal client" Jorge to protect the interests of its "real clients" (institutional lenders) by preventing a sale of the vessel eradicating the lenders' large mortgages.

A

### State Court Consideration of Collusion

■ Andrade contends as a matter of law the federal court judgment precluded state court "reconsideration" of the collusion issue. Andrade asserts Jennings was barred in this collateral action from attacking the federal judgment as collusive since Jennings had notice of his potential liability but did nothing until after the federal court prove-up hearing. Citing *Pruyn* v. *Agricultural Ins. Co.* (1995) 36 Cal.App.4th 500, 517 [42 Cal.Rptr.2d 295]; *National Union Fire Ins. Co.* v. *Lynette C.* (1994) 27 Cal.App.4th 1434 [33 Cal.Rptr.2d 496]; *Roman* v. *Unigard Ins. Group* (1994) 26 Cal.App.4th 177 [31 Cal.Rptr.2d 501]; *Sanchez* v. *Truck Ins. Exchange* (1994) 21 Cal.App.4th 1778, 1789 [26 Cal.Rptr.2d 812]; and *Xebec Development Partners, Ltd.* v. *National Union Fire Ins. Co.* (1993) 12 Cal.App.4th 501, 541 [15 Cal.Rptr.2d 726], Andrade contends recent case law recognizes that "even an uncontested prove-up hearing coupled with a covenant not to execute is sufficient to bind the insurer so long as there is 'a semblance of independent adjudication.' "[10] Asserting the prove-up hearing before the federal magistrate constituted an adequate independent adjudication of his claim, Andrade concludes Jennings could have moved timely to

---

[10] In *Pruyn* v. *Agricultural Ins. Co., supra,* 36 Cal.App.4th 500, the appellate court observed that for purposes of bringing a direct action against an insurer under Insurance Code section 11580, a third party judgment creditor must have a final judgment against the insured but ". . . a number of cases have held that such judgment need not be based on a contested or adversarial trial, but may rest upon a default hearing held following a settlement [citations] or an uncontested trial where the insured settled with the claimant and thereafter presented no defense. [Citation.] These circumstances necessarily involve significant independent adjudicatory action by the court, thus mitigating the risk of a fraudulent or collusive settlement between an insured and the claimant. Final judgments entered under either of these

intervene in the federal action to object to the amount of damages sought by Andrade but chose not to do so and thus must bear the consequences.

Contrary to Andrade's contention, the cases he cites do not establish a bright line rule barring Jennings from asserting the defense of collusion simply because Jennings despite notice failed to attend a prove-up hearing involving some independent adjudicatory action by a court. Instead, case law indicates that the circumstances where the defense of collusion may properly be asserted are varied. (E.g., *Pruyn* v. *Agricultural Ins. Co.*, *supra*, 36 Cal.App.4th at pp. 517, fn. 16, 518, 522, 526; *National Union Fire Ins. Co.* v. *Lynette C.*, *supra*, 27 Cal.App.4th 1434.)[11] Hence, that Jennings knew of the upcoming prove-up hearing but declined to participate was simply one factor

circumstances are binding on the insurer which has wrongfully abandoned its insured and may be enforced directly under Insurance Code section 11580. [¶] There is a sound reason why this should be so. The insurer not only had a right to participate in and to control the litigation, it had a duty to do so. An insurer which has wrongfully abandoned its insured should not be heard to complain or allowed to relitigate the trial court's judgment merely because the default or uncontested proceedings followed, and were related to, an agreement between the insured and the claimant. Whatever the terms of the settlement, the entry of judgment was based on an independent review and adjudication of the evidence by the trial court. An insurer which has breached its contract is properly bound by the result of such trial proceedings . . . . [Citation.]" (*Id.* at pp. 516-517.) However, the appellate court cautioned: "We exclude, of course, those trial proceedings which are clearly a patent sham collusively designed to create a judgment for which liability insurance coverage would then exist. [Citation.]" (*Id.* at p. 517, fn. 16.)

In *National Union Fire Ins. Co.* v. *Lynette C.*, *supra*, 27 Cal.App.4th 1434, the appellate court stated: "In deciding whether a judgment involving the injured party and the insured is binding on the insurer, courts focus on whether the facts have been adjudicated independently in a process that does not create the potential for abuse, fraud or collusion. This concern is heightened when the injured party provides the insured with a covenant not to execute." (*Id.* at p. 1449.)

In *Sanchez* v. *Truck Ins. Exchange*, *supra*, 21 Cal.App.4th 1778, the appellate court stated the "potential for abuse and collusion" was not at issue since the underlying settlement had been determined by a court to satisfy the good faith criteria of *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499 [213 Cal.Rptr. 256, 698 P.2d 159]. (*Sanchez*, *supra*, at p. 1789.) Citing *Sanchez*, the appellate court in *Roman* v. *Unigard Ins. Group*, *supra*, 26 Cal.App.4th 177, concluded there was "no basis for concern" that "the parties engaged in collusive" conduct since the stipulated judgment and assignment "was specifically approved as a good faith settlement under Code of Civil Procedure section 877.6 after a thorough hearing." (*Id.* at p. 184.)

In *Xebec Development Partners, Ltd.* v. *National Union Fire Ins. Co.*, *supra*, 12 Cal.App.4th 501, recognizing a "significant distinction" between a default judgment and the stipulated judgment entered there, the appellate court stated ". . . the default proving-up proceeding preserved a semblance of independent adjudication under court supervision which is wholly lacking in this case." (*Id.* at p. 541.)

[11]In *Pruyn* v. *Agricultural Ins. Co.*, *supra*, 36 Cal.App.4th 500, a case involving the enforceability in a direct action against an insurer of a stipulated judgment accompanied by a covenant not to execute, the appellate court stated: "A nonparty insurer must be given a fair opportunity to litigate the question of whether the settlement was unreasonable or was the product of fraud or collusion." (*Id.* at p. 526.) The appellate court observed that the "critical

for consideration by the trier of fact in adjudicating his collusion-based defense. Further, Andrade's reliance on *National Union Fire Ins. Co.,* is misplaced as the issue of fraud or collusion was not before the court there since the insurer had not challenged an earlier unfavorable adjudication on that issue. (27 Cal.App.4th at pp. 1444, fn. 7, 1456-1457, fn. 11.) Moreover, the other cases cited by Andrade involved insurers' wrongful denials of coverage or refusals to defend, significant circumstances not present here. (*Pruyn* v. *Agricultural Ins. Co., supra,* at pp. 509, 513, 516;[12] *Roman* v. *Unigard Ins. Group, supra,* 26 Cal.App.4th at pp. 180-181; *Sanchez* v. *Truck Ins. Exchange, supra,* 21 Cal.App.4th at p. 1783; *Xebec Development Partners, Ltd.* v. *National Union Fire Ins. Co., supra,* 12 Cal.App.4th at pp. 538-540.)

In sum, Jennings's defense of collusion was properly submitted to the jury.

## B

### *Substantial Evidence of Collusion*

▮   Andrade attacks as lacking substantial evidentiary support the jury's finding he participated in collusion producing the settlement agreement

---

question" remained, to wit, "was the settlement reasonable and free of fraud and collusion? It is upon the resolution of that issue that plaintiff's case will depend." (*Id.* at p. 522.)

In *National Union Fire Ins. Co.* v. *Lynette C., supra,* 27 Cal.App.4th 1434, a case involving the meaning of a contractual clause permitting a direct action by the injured party against the insured tortfeasor's insurance carrier if " 'the amount of the insured's obligation to pay [has] been finally determined by judgment against the insured after actual trial'[,]" the appellate court concluded "the term 'actual trial' has two components: (1) an independent adjudication of facts based on an evidentiary showing; *and* (2) a process that does not create the potential for abuse, fraud or collusion." (*Id.* at p. 1438, italics added.)

[12]In *Pruyn* v. *Agricultural Ins. Co., supra,* 36 Cal.App.4th 500, the appellate court held when "a liability insurer wrongfully denies coverage or refuses to provide a defense, then the insured is free to negotiate the best possible settlement consistent with his or her interests, including a stipulated judgment accompanied by a covenant not to execute. Such a settlement will raise an evidentiary presumption in favor of the insured (or the insured's assignee) with respect to the existence and amount of the insured's liability. The effect of such presumption is to shift the burden of proof to the insurer to prove that the settlement was unreasonable or the product of fraud or collusion." (*Id.* at p. 509.) In *Pruyn,* the appellate court expressly declined to follow *Roman* v. *Unigard Ins. Group, supra,* 26 Cal.App.4th 177, and *Sanchez* v. *Truck Ins. Exchange, supra,* 21 Cal.App.4th 1778, insofar as "either case could be construed as binding a nonparty insurer to the good faith determination [under section 877.6] with no procedural opportunity whatever to contest the issues of fraud or collusion . . . ." (*Pruyn, supra,* at p. 526.) In *Pruyn,* the appellate court stated: "[W]e simply cannot read either *Sanchez* or *Roman* to mean that an insurer is bound by the good faith determination and cannot litigate the bona fides of the settlement in either the direct action brought to enforce the stipulated judgment or in the bad faith action, the assignment of which is based on such judgment." (*Pruyn, supra,* at p. 526.)

and federal judgment. Asserting the evidence was essentially undisputed, Andrade contends the parties disagree only on the reasonable inferences permissibly drawn from such evidence. However, as we shall explain, substantial evidence and reasonable inferences supported the jury's findings (1) Jorge breached the covenant of good faith and fair dealing owed to Jennings; (2) Jorge breached the duty of assistance and cooperation contained in the excess policy issued by Jennings; (3) the November 18, 1986, settlement agreement was the product of collusion between Andrade and Jorge; and (4) the judgment awarded by the federal magistrate was the product of collusion between Andrade's counsel and Jorge's counsel.

1

*The Law*

"What constitutes collusion will differ with each fact situation." (*Span, Inc.* v. *Associated Internat. Ins. Co.* (1991) 227 Cal.App.3d 463, 484 [277 Cal.Rptr. 828].) In *Span, Inc.*, the appellate court stated: " 'Collusion has been variously defined as (1) "a deceitful agreement or compact between two or more persons, for the one party to bring an action against the other for some evil purpose, as to defraud a third party of his right"; (2) "a secret arrangement between two or more persons, whose interests are apparently conflicting, to make use of the forms and proceedings of law in order to defraud a third person, or to obtain that which justice would not give them, by deceiving a court or its officers"; and (3) "a secret combination, conspiracy, or concert of action between two or more persons for fraudulent or deceitful purposes." [Citation.]' [Citation.]" (*Ibid.*)[13]

Jennings may raise the defense of collusion against Andrade because " '[a]s against the injured person an insurer may assert a defense based on breach by the insured of the cooperation clause of the policy. [Citations.]' [Citation.] Collusive assistance in the procurement of a judgment not only constitutes a breach of the cooperation clause but also is a breach of the covenant of good faith and fair dealing." (*Span, Inc.* v. *Associated Internat. Ins. Co., supra,* 227 Cal.App.3d at p. 483.)

As the insured, Jorge owed its excess insurer Jennings the duty of good faith and fair dealing. *(Kaiser Foundation Hospitals* v. *North Star Reinsurance Corp.* (1979) 90 Cal.App.3d 786, 792-793 [153 Cal.Rptr. 678]; cf. *California Casualty Gen. Ins. Co.* v. *Superior Court* (1985) 173 Cal.App.3d

---

[13]The trial court's instructions to the jury on collusion included the substance of the definition set forth in *Span, Inc.* v. *Associated Internat. Ins. Co., supra,* 227 Cal.App.3d at page 484.

274, 283 [218 Cal.Rptr. 817].) An insured may not manipulate claims to an excess carrier's detriment. (*Kaiser Foundation Hospitals* v. *North Star Reinsurance Corp.*, *supra*, at p. 792, fn. 9.) In *Andrade I*, *supra*, D014569, we observed that the "issue of collusion subsumes the issue whether the insured Jorge breached the contractual assistance and cooperation clauses or the implied covenant of good faith and fair dealing."

■ The jury's finding of collusion will not be disturbed on appeal if supported by substantial evidence. (*Reddy* v. *Gonzalez* (1992) 8 Cal.App.4th 118, 123 [10 Cal.Rptr.2d 55].) "Substantial evidence in this regard is any evidence which is not 'unbelievable per se.' [Citation.] When two inferences can reasonably be drawn from the facts presented, this court is without power to substitute its deductions for those of the trial court. [Citation.]" (*In re Marriage of Kahan* (1985) 174 Cal.App.3d 63, 66 [219 Cal.Rptr. 700].) An appellate court may not judge the evidence's effect or value, reweigh the evidence, consider the credibility of witnesses, or resolve evidentiary conflicts. (*Reddy* v. *Gonzalez*, *supra*, at p. 123.) "The jury's verdicts are entitled to a great deal of respect from this court, particularly when they have been approved by the trial judge by virtue of his denial of a motion for a new trial." (*Wayte* v. *Rollins International, Inc.* (1985) 169 Cal.App.3d 1, 21 [215 Cal.Rptr. 59].)

2

*Analysis*

■ Andrade acknowledges the record contained evidence Gray Cary violated the assistance and cooperation clauses of the excess policy issued by Jennings and thus committed a fraud on Jennings by not providing Jennings with a copy of Andrade's initial offer to settle for $950,000, not providing Jennings with a copy of Andrade's proposal to settle by stipulated judgment for $1.5 million, not immediately providing Jennings with a copy of the economist's report indicating Andrade's wage loss exceeded $1.2 million, entering into the settlement agreement, and not presenting a defense at the federal prove-up hearing. However, Andrade contends such evidence of Gray Cary's wrongdoing was too weak to overcome the assertedly otherwise uncontradicted evidence that Dougherty simply represented Andrade's interests honestly and vigorously consistent with his obligations as an advocate. In essence, Andrade attacks as speculation and conjecture the finding he or his attorney participated in collusion. Review of the evidentiary record belies Andrade's contentions.

(a)

*Settlement*

The jury reasonably concluded Andrade's settlement agreement with Jorge was collusive against Jennings as unreasonable and made in bad faith. (Cf. *Isaacson* v. *California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 791 [244 Cal.Rptr. 655, 750 P.2d 297].) Jorge had a duty not to manipulate Andrade's claim to Jennings's detriment. (*Kaiser Foundation Hospitals* v. *North Star Reinsurance Corp.*, *supra*, 90 Cal.App.3d at pp. 792-793.) However, substantial evidence and reasonable inferences established that Jorge and Andrade crafted the settlement with the specific aim to injure Jennings.

The reasonable settlement value of Andrade's claim was between $150,000 and $250,000. In January 1986 Gray Cary told Jennings's attorney, Booth, that Andrade's case had a $200,000 settlement value. Booth asked Gray Cary to provide any information indicating that Andrade's claim might exceed $1 million and to update him on matters bearing on liability, damages, medical complaints and depositions.

Meanwhile, in December 1985 and January 1986, Andrade's counsel Dougherty demanded $950,000 from Jorge to settle the claim. Such demand took into account Andrade's future medical costs including the recommended back surgery and Andrade's claimed wage losses exceeding $1 million. Dougherty usually compromised seamen's claims for between one-third and two-thirds of his opening demand. However, in May 1986 Dougherty was formally notified by Gray Cary that in light of American Maritime's insolvency Jorge lacked primary insurance covering Andrade's claim. Dougherty was also asked by Gray Cary for an "immediate demand." In June 1986 Dougherty met with Gray Cary's Kammer for two hours. Immediately after the meeting Dougherty drafted and filed an offer to compromise under section 998 for the increased amount of $1.5 million, despite knowing Andrade was recovering well from his back surgery.

In July 1986 Dougherty began negotiating settlement with Gray Cary's Driscoll. Dougherty contemplated "activating" Andrade's federal court lawsuit to seek a magistrate's approval of a "stipulated judgment" for $1.5 million, with Andrade agreeing not to execute the judgment against Jorge or the vessel in return for Jorge's assigning to Andrade its rights against Jennings. The effect of such settlement would be to trigger Jennings's excess coverage but leave Jorge Fishing and the vessel's mortgage holders without damage exposure. During the next four months, Gray Cary, Dougherty and

the mortgage holders engaged in three-way settlement negotiations. On November 18, 1986, Andrade and Jorge executed a settlement agreement entitled "Assignment of Rights and Claims and Covenant Not to Execute Upon the Assets of Defendant." However, as noted, Jorge was contractually prohibited from settling any claim to Jennings's detriment without Jennings's permission.

As Andrade concedes, the jury heard evidence that despite the policy language and its duty of good faith, Jorge did not provide Booth or Jennings with timely notice of Andrade's demands, settlement negotiations and other relevant information indicating Andrade's claim might exceed $1 million. (*California Casualty Gen. Ins. Co.* v. *Superior Court, supra*, 173 Cal.App.3d at p. 283; *Kaiser Foundation Hospitals* v. *North Star Reinsurance Corp.*, *supra*, 90 Cal.App.3d at pp. 792-793.) Indeed, during July 1986, Gray Cary's Kammer again told Booth that Andrade's claim could be settled if Jennings paid Andrade about $200,000. Further, in July 1986, Gray Cary told Jorge's creditors about the settlement negotiations and Andrade's section 998 offer to compromise for $1.5 million, but did not provide Jennings or Booth with such information until almost a year later. Moreover, when volunteering information to Jennings by phone calls and letters during that interval, Jorge concealed relevant facts including Andrade's settlement proposals, the on-going settlement discussions, and the economist's report estimating Andrade's wage loss at $1,243,993. ▓▓▓ ▓▓▓ (*Lacher* v. *Superior Court* (1991) 230 Cal.App.3d 1038, 1046-1047 [281 Cal.Rptr. 640]; *Cicone* v. *URS Corp.* (1986) 183 Cal.App.3d 194, 201 [227 Cal.Rptr. 887].[14]) ▓▓▓ Gray Cary also delayed informing Jennings or Booth about existence of Jorge's $1.5 million settlement agreement with Andrade executed on November 18, 1986. Not until May 26, 1987, despite four letters from Gray Cary to Booth during the interval, was Jennings notified of the executed written settlement agreement. Based upon such evidence, the jury could reasonably conclude Jorge through Gray Cary breached its duties to Jennings of assistance, cooperation and good faith and, indeed, for many months concealed information from Jennings.

Other factors properly considered by the jury also indicated Andrade's settlement agreement with Jorge was unreasonable and made in bad faith. ▓▓▓ In determining whether a settlement is reasonable and made in good

---

[14]"Although a duty to disclose a material fact normally arises only where there exists a confidential relation between the parties or other special circumstances require disclosure, where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated. [Citation.] One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud. [Citations.]" (*Cicone* v. *URS Corp., supra*, 183 Cal.App.3d at p. 201.)

faith, jurors may take into account the amount of the overall settlement in light of the value of the case (*Abbott Ford, Inc.* v. *Superior Court* (1987) 43 Cal.3d 858, 873-874 [239 Cal.Rptr. 626, 741 P.2d 124]; *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates*, *supra*, 38 Cal.3d at pp. 499-500); a comparison with awards or verdicts in similar cases involving similar injuries (*Samson* v. *Transamerica Ins. Co.*, *supra*, 30 Cal.3d at p. 242; *Scala* v. *Moore McCormack Lines, Inc.* (2d Cir. 1993) 985 F.2d 680, 684; *Bohemia, Inc.* v. *Home Ins. Co.* (9th Cir. 1984) 725 F.2d 506, 510-511); the facts known to the settling insured at the time of the settlement (*Abbott Ford, Inc.* v. *Superior Court*, *supra*, at p. 874; *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates*, *supra*, at p. 499; *Xebec Development Partners, Ltd.* v. *National Union Fire Ins. Co.*, *supra*, 12 Cal.App.4th at pp. 554-555); the presence of a covenant not to execute as part of the settlement (12 Cal.App.4th at pp. 537-538); and the failure of the settling insured to consider viable available defenses (*Andrade I, supra*, D014569; *Span, Inc.* v. *Associated Internat. Ins. Co., Inc.*, *supra*, 227 Cal.App.3d at pp. 484-485).

▓ As noted, three witnesses testified the reasonable settlement value of Andrade's claim was between $150,000 and $250,000. Further, Gray Cary's Kammer twice told Booth the settlement value of Andrade's case was $200,000. However, Jorge and Andrade settled for $1.5 million. (*Abbott Ford, Inc.* v. *Superior Court*, *supra*, 43 Cal.3d at pp. 873-874; *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates*, *supra*, 38 Cal.3d at pp. 499-500.)

As also noted, at the time of Andrade's settlement with Jorge there had been no local settlement or judgment exceeding $1 million in a similar maritime case. Further, the highest settlements in cases involving tuna boat captains undergoing back operations and claiming permanent disability had not exceeded $350,000. Additionally, the largest prior jury verdict obtained by Dougherty's firm in a maritime case was $900,000. (*Samson* v. *Transamerica Ins. Co.*, *supra*, 30 Cal.3d at p. 242; *Scala* v. *Moore McCormack Lines, Inc.*, *supra*, 985 F.2d at p. 684; *Bohemia, Inc.* v. *Home Ins. Co.*, *supra*, 725 F.2d at pp. 510-511.)

Finally, the jury could also reasonably conclude available defenses not asserted by Jorge at the prove-up hearing could have reduced Andrade's provable damages to under $1 million. (*Andrade I, supra*, D014569; *Span, Inc.* v. *Associated Internat. Ins. Co., Inc.*, *supra*, 227 Cal.App.3d at pp. 484-485.) Evidence indicated a vigorous defense effort would have raised

weaknesses in Andrade's liability case,[15] Andrade's contributory negligence,[16] the speculative nature of Andrade's claimed future wage losses, and Andrade's work history and personal factors. At a minimum, such factors should have been considered for settlement purposes.

Based on such evidence, the jury could reasonably conclude the settlement amount of $1.5 million was unreasonable and known to be so by Andrade and Jorge. The jury could also reasonably conclude Andrade and Jorge crafted the settlement specifically to injure Jennings. (*Span, Inc.* v. *Associated Internat. Ins. Co., supra*, 227 Cal.App.3d at pp. 483-484; *Kaiser Foundation Hospitals* v. *North Star Reinsurance Corp., supra*, 90 Cal.App.3d at pp. 792-793.) In sum, substantial evidence and reasonable inferences supported the jury's finding the settlement agreement was the product of collusion between Andrade and Jorge.

(b)

*Judgment*

(8a) Substantial evidence and reasonable inferences also established Andrade and Jorge obtained the federal judgment in a collusive manner. (*Span, Inc.* v. *Associated Internat. Ins. Co., supra*, 227 Cal.App.3d at p. 483.) The judgment arose out of their collusive settlement. Where a party wields a settlement "as a sword to enforce its rights as an indemnitee, due process mandates at a minimum appropriate notice and an opportunity for the indemnitor to contest both liability and the amount of damages." (*Western Steamship Lines, Inc.* v. *San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 118, fn. 15 [32 Cal.Rptr.2d 263, 876 P.2d 1062]; cf. *Babbitt* v. *Babbitt* (1955) 44 Cal.2d 289, 293 [282 P.2d 1].)[17]

In June 1986, Andrade's counsel Dougherty and Jorge's counsel Gray Cary began discussing a $1.5 million stipulated federal judgment. In November 1986 Dougherty and Gray Cary executed the settlement agreement contemplating entry of the $1.5 million judgment at a federal prove-up hearing. Counsel intended that the prove-up hearing would be an unopposed proceeding. Despite numerous phone calls and letters to Jennings's attorney

---

[15]There was no evidence that either Andrade or Mamede actually saw or felt aviation fuel on the ladder at the time of Andrade's injury.

[16]Evidence indicated Jorge knew Andrade habitually drank on duty and believed Andrade was drinking at the time of his injury.

[17]"It is the general rule that a judgment obtained in fraud of the interests of a third person is not binding upon him. [Citations.]" (*Babbitt* v. *Babbitt, supra*, 44 Cal.2d at p. 293.)

Booth, not until May 26, 1987, did Gray Cary notify Booth of the executed settlement agreement and the prove-up hearing scheduled for June 26, 1987. Eventually, the hearing was continued to July 21, 1987. However, although Jennings was ultimately given two months to prepare for the hearing, Gray Cary initially intended to give Jennings less than two weeks' notice.

At the prove-up hearing, Jorge did not contest damages.[18] Neither did Jorge present liability defenses.[19] Although Andrade's covenant not to execute in return for Jorge's assignment of claims rendered Jorge and the vessel's mortgage holders immune from damages, the record contains nothing suggesting the magistrate was informed of such covenant. (*Xebec Development Partners, Ltd.* v. *National Union Fire Ins. Co., supra,* 12 Cal.App.4th at pp. 537-538; *Wright* v. *Fireman's Fund Ins. Companies* (1992) 11 Cal.App.4th 998, 1023 [14 Cal.Rptr.2d 588]; *Smith* v. *State Farm Mut. Auto. Ins. Co.* (1992) 5 Cal.App.4th 1104, 1114 [7 Cal.Rptr.2d 131].)[20] At the end of the hearing, the magistrate awarded Andrade the amount he requested. An expert witness described the prove-up hearing as a "one-sided sham" and "charade" with the resulting judgment the product of collusion by Andrade and Jorge.

Further, the jury heard evidence supporting a conclusion Jennings's absence at the federal prove-up hearing was reasonable under the circumstances. In light of Jorge's having effectively admitted liability in the executed settlement agreement, Booth believed not unreasonably that Jennings's appearance at the hearing would be pointless. (Cf. *Western Steamship Lines, Inc.* v. *San Pedro Peninsula Hospital, supra,* 8 Cal.4th at p. 118, fn. 15.) Moreover, expert testimony indicated Booth satisfied all duties of inquiry required of excess insurer Jennings. ▬ ▬ ▬ (*Span,*

---

[18]On March 20, 1987, Andrade had undergone a physical examination by his treating physician Dickinson revealing a "successful" fusion with attendant scar and "a 20 percent limitation in his ability to move his back at the extremes." Dr. Dickinson did not tell Andrade he was permanently disabled from doing any sort of work. Dickinson's report was not presented to the magistrate.

[19]The magistrate was not told of the absence of direct evidence of the cause of Andrade's fall.

[20]The covenant not to execute "may bear circumstantially upon the validity" of the transactions between Andrade and Jorge. (*Xebec Development Partners, Ltd.* v. *National Union Fire Ins. Co., supra,* 12 Cal.App.4th at p. 537.)

In *Wright* v. *Fireman's Fund Ins. Companies, supra,* 11 Cal.App.4th 998, concurring with the concern expressed in earlier cases about "the potential for abuse and collusion when a stipulated judgment or settlement under which the insured has no personal liability binds the insurer[,]" we observed: "With no personal exposure the insured has no incentive to contest liability or damages. To the contrary, the insureds' best interests are served by agreeing to damages in any amount as long as the agreement requires the insured will not be personally responsible for those damages." (*Id.* at p. 1023.)

*Inc.* v. *Associated Internat. Ins. Co., supra,* 227 Cal.App.3d at p. 483.)[21]
**(8c)** Booth knew that Gray Cary was providing Jorge with a defense. Gray Cary did not tell Booth its defense would cease in the future. During 1986 and 1987, Booth was in frequent communication with Gray Cary and had no reason to believe Gray Cary was withholding requested or necessary information about Andrade's claim. According *to* the expert's testimony, Booth was entitled to believe that Gray Cary's attorneys were truthful and were providing him with complete and accurate information about the status of the claim.

In sum, based upon such substantial evidence and reasonable inferences, the jury reasonably concluded the federal judgment resulting from the collusive settlement was the product of collusion between Andrade's counsel and Jorge's counsel. (*Span, Inc.* v. *Associated Internat. Ins. Co., supra,* 227 Cal.App.3d at p. 483.)

## C

### *Damages*

■ Andrade contends that even if there was collusion, Jennings was not damaged since Jennings assertedly knew everything necessary to protect his own rights in the federal lawsuit. In essence, Andrade attacks as lacking substantial evidentiary support the jury's findings Jennings was prejudiced by Jorge's breach of the excess policy's assistance and cooperation clauses and by Jorge's breach of the covenant of good faith and fair dealing. However, on this record the jury reasonably concluded Jorge's misconduct caused Jennings to suffer substantial prejudice.

The exposure of excess carrier Jennings arose when Jennings knew or should have known the limits of Jorge's primary insurance would likely become exhausted triggering the excess coverage provided by Jennings. (*Samson* v. *Transamerica Ins. Co., supra,* 30 Cal.3d at pp. 237-239; *Signal Companies, Inc.* v. *Harbor Ins. Co.* (1980) 27 Cal.3d 359, 367 [165 Cal.Rptr. 799, 612 P.2d 889, 19 A.L.R.4th 75]; *Span, Inc.* v. *Associated Internat. Ins. Co., supra,* 227 Cal.App.3d at p. 483; *Kaiser Foundation Hospitals* v. *North Star Reinsurance Corp., supra,* 90 Cal.App.3d at pp. 791-792.) Determination of such issue was a factual question for the jury. (Cf. *Nevis* v. *Pacific Gas & Electric Co.* (1954) 43 Cal.2d 626, 632 [275 P.2d 761].)

---

[21]Generally, a finding an excess insurer had adequate notice a claim would likely involve its layer of coverage requires the excess insurer to pay the excess portion of the judgment within its limits. (*Span, Inc.* v. *Associated Internat. Ins. Co., supra,* 227 Cal.App.3d at p. 483.) "Where the excess insurer is on notice the primary insurer is insolvent, an increased duty to inquire arises because the ordinary presumption that the primary carrier will 'provide an experienced defense' [citation], no longer applies." (*Ibid.*)

Jennings presented expert testimony that the economist's report concluding Andrade suffered $1.2 million economic loss constituted the first indication that Andrade's claim would likely enter the excess layer of insurance provided by Jennings. Jennings first learned of such report on March 6, 1987, when it was provided by Gray Cary. However, by that time, Jorge was already in breach of his express and implied contractual covenants by concealing Andrade's $1.5 million settlement demand from Jennings, not providing the economist's report earlier, engaging in settlement negotiations to invoke coverage under the excess policy issued by Jennings, and executing a settlement agreement containing a covenant not to execute and contemplating an uncontested $1.5 million judgment.

Expert testimony also indicated the settlement agreement with its contemplated unopposed judgment placed Jennings in a position of "ultimate prejudice" since the liability issue was a "done deal" upon Jorge's agreement to "give away" all defenses it might otherwise assert against Andrade. Hence, the jury could reasonably conclude that by such time Jennings lacked any meaningful opportunity to present a proper defense of the case, particularly with respect to issues of liability. (*Western Steamship Lines, Inc.* v. *San Pedro Peninsula Hospital, supra,* 8 Cal.4th at p. 118, fn. 15; cf. *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 555 [116 Cal.Rptr. 245, 526 P.2d 253].)

In sum, substantial evidence and reasonable inferences supported the jury's findings Jorge's misconduct prejudiced Jennings.

### D

### *Andrade's Direct Claim Against Jennings*

Finally, Andrade contends that even if the jury finding of collusion is upheld, his direct action against Jennings is not barred. Andrade asserts any collusion voided only the settlement agreement and did not relieve Jennings of his contractual obligation to provide coverage for Andrade's injuries. Hence, Andrade concludes he should be able to return to the trial court with another opportunity to prove his damages.

Jennings contends parties participating in crafting a collusive settlement are *"in pari delicto"* and may be barred from judicial aid. (*River Garden Farms, Inc.* v. *Superior Court* (1972) 26 Cal.App.3d 986, 1000 [103 Cal.Rptr. 498].) Jennings contends that Andrade as Jorge's assignee possessed only those remedies Jorge had against Jennings and was subject to any defenses Jennings had against Jorge. (*Smith* v. *State Farm Mut. Auto. Ins.*

*Co., supra,* 5 Cal.App.4th at p. 1111; *Woolett* v. *American Employers Ins. Co.* (1978) 77 Cal.App.3d 619, 625 [143 Cal.Rptr. 799].) Hence, asserting collusion is a defense to coverage *(Span, Inc.* v. *Associated Internat. Ins. Co., supra,* 227 Cal.App.3d at p. 483), Jennings concludes the jury's finding of collusion barred Andrade from any recovery against the excess policy issued by Jennings.

However, we do not reach Andrade's contention about the consequences of the finding of collusion. As Andrade acknowledges, this issue was not briefed or decided in the superior court. Since the issue was not framed before the trial court, its resolution is for another day.

## DISPOSITION

The judgment is affirmed.

Benke, J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 9, 1997.